851 A.2d 566

**Judith Edwards PATTON, individually, and as the Surviving Spouse of Donald Lee Patton, and as personal representative and executor for the Estate of Donald Lee Patton, et al.**

**v.**

**UNITED STATES OF AMERICA RUGBY FOOTBALL, Union, Ltd. d/b/a USA Rugby, et al.**

**No. 113, Sept. Term, 2003.**

Court of Appeals of Maryland.

June 10, 2004.

W. David Allen, Crofton, for appellants.

Kristine A. Crosswhite (Crosswhite, McKenna, Limbrick & Sinclair, LLP, Baltimore, on brief), Barry C. Goldstein (Neal M. Brown, Waranch & Brown, LLC, Lutherville, on brief), for appellees.

Argued before BELL, C.J. RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

On 17 June 2000, Robert Carson Patton, II, and his father, Donald Lee Patton, while at an amateur rugby tournament in Annapolis, were struck by lightning. Robert, a player in the tournament, was seriously injured, but survived. Donald, a spectator watching his son play, died. Robert and various other members of the Patton family filed suit in the Circuit Court for Anne Arundel County alleging negligence against the rugby tournament organizers, referee, and related organizations with regard to the episode.

Defendants filed Motions to Dismiss arguing they owed no legal duty to Robert and Donald Patton. A hearing was held and, on 10 July 2003, the Circuit Court dismissed the action. The Patton family appealed. This Court, on its own initiative and before the appeal could be decided in the Court of Special Appeals, issued a writ of certiorari to determine whether any of the defendants, under the circumstances alleged in the complaint, owed a legal duty to Robert and Donald Patton. *Patton v. USA Rugby*, 379 Md. 224, 841 A.2d 339 (2004).

I.

A. The Lightning Strike

Based on Appellants' amended complaint, we assume the

truth of the following factual allegations: [1]

Sometime during the early morning of 17 June 2000, Robert and Donald Patton arrived at playing fields adjacent to the Annapolis Middle School in Anne Arundel County, Maryland. Robert was to play rugby for the Norfolk Blues Rugby Club. Donald intended to support his son as a spectator. Robert and Donald, along with other participants and spectators, placed their equipment and belongings under a row of trees adjacent to the playing fields.

The rugby tournament was coordinated by Steven Quigg and was sanctioned by the United States of America Rugby Football Union, Ltd., d/b/a USA Rugby, and Mid–Atlantic Rugby Football Union, Inc. Rugby matches involving over two dozen teams began at approximately 9:00 a.m. and were planned to continue throughout the day. It was a warm, muggy day. The weather forecast for Annapolis was for possible thunderstorms. At some point prior to the start of the twenty minute match between the Norfolk Blues and the Washington Rugby Football Club ("the match"), a thunderstorm passed through the area surrounding the Annapolis Middle School. At the start of the match, rain commenced; lightning could be seen and thunder could be heard proximate to the lightning flashes. By this time, the National Weather Service had issued a thunderstorm "warning" for the Annapolis area.

Kevin Eager, a member of the Potomac Society of Rugby Football Referees, Inc., was the volunteer referee for the afternoon match in which Robert Patton was a participant. Under the direction of Eager, the match continued as the rain increased in intensity, the weather conditions deteriorated, and the lighting flashed directly overhead. Other matches at

---

1. *See Valentine v. On Target, Inc.,* 353 Md. 544, 548, 727 A.2d 947, 949 (1999) ("as the result of the trial court's granting a motion to dismiss, as opposed to the granting of summary judgment or judgment entered after trial, the Court will assume the truth of all well-pleaded facts and any reasonable inferences that can be properly drawn therefrom") (citations omitted).

the tournament ended. Robert Patton continued to play the match through the rain and lightning and his father continued to observe as a spectator until the match was stopped just prior to its normal conclusion.

Upon the termination of the match, Robert and Donald fled the playing fields to the area under the trees where they left their possessions. As they began to make their exit from under the trees to seek the safety of their car, each was struck by lightning. Donald died. Robert Patton sustained personal injuries and was hospitalized, but recovered.

## B. Circuit Court Proceedings

Appellants here and Plaintiffs below are Judith Edwards Patton (wife of Donald Patton), acting in both an individual capacity and as personal representative of the estate of Donald Patton; Sophia P. Patton and Robert C. Patton (the parents of Donald Patton); Robert Carson Patton, II; and Meredith Patton (Donald's daughter). They sued the United States of America Rugby Football Union, Ltd., d/b/a USA Rugby ("USA Rugby"), the Mid–Atlantic Rugby Football Union, Inc. ("MARFU"), the Potomac Rugby Union, Inc. ("PRU"), the Potomac Society of Rugby Football Referees, Inc. ("Referees' Society"), Kevin Eager,[2] and Steven Quigg, alleging that Defendants were liable in tort for the death of Donald Patton and the injuries suffered by Robert Patton. This liability, Appellants contended, was due to Defendants'/Appellees' failure to employ proper policies and procedures to protect players and spectators at the tournament from lightning strikes.

Appellants alleged that Appellees each had a duty to, but failed to, do one or more of the following acts:

"(a) Have and implement proper policies and procedures regarding the protection of players and spectators from adverse weather conditions and lightning;

---

2. Kevin Eager never was served with process.

"(b) Have and implement a policy regarding the safe evacuation of players and spectators from the fields of play at its matches when lightning is present;

"(c) Safeguard the health, safety, and welfare of the players and spectators at its matches;

"(d) Terminate the rugby match and tournament when lightning is present;

"(e) Monitor and detect dangerous conditions associated with its matches; and

"(f) Train, supervise, monitor and control actions of officials prior to ensure the safety of the participants and spectators from dangerous lightning strikes."

On 26 August 2002, the Referees' Society filed a Motion to Dismiss all claims pending against it on the ground that the Referees' Society owed no tort duty to Robert or Donald Patton as a matter of law. Thereafter, on 16 September 2002, USA Rugby, MARFU, and Steven Quigg filed a joint Motion to Dismiss in which they adopted the arguments of the Referees' Society and advanced the additional argument that Maryland's Recreational Land Use Statute, found in Maryland Code (1974, 2000 Repl.Vol., 2003 Supp.), § 5–1101, *et seq.* of the Natural Resources Article, conferred tort immunity on them for injuries arising from recreational use of premises, i.e., playing rugby on the Annapolis Middle School fields.[3]

Appellants, on 30 December 2002, filed an amended complaint. On 9 January 2003, USA Rugby, MARFU, PRU, and Mr. Quigg filed a second Motion to Dismiss, or in the alternative, for Summary Judgment. The Motion to Dismiss argued that: (1) Appellees owed the Pattons no legally cognizable tort duty as a matter of law; (2) Appellees are immune from tort liability under Maryland's Recreational Land Use Statute;

---

**3.** PRU was not served with process at the time that USA Rugby, MARFU, and Mr. Quigg filed their Motion to Dismiss and, consequently, PRU was not included in that motion as a moving party. PRU timely filed an Answer to Appellants' original Complaint on 15 October 2002, and thereafter, was included as a moving party on all pending defense motions.

and (3) the claims of Robert were barred by waiver. On 13 January 2002, the Referees' Society also filed a Motion to Dismiss the amended complaint.

The pending motions were heard on 5 February 2003. The Circuit Court, subsequently, issued an order granting the pending motions to dismiss and, on 17 November 2003, issued a Memorandum Opinion explaining the reasons for the dismissal.

Based on Maryland precedents and caselaw from other jurisdictions, the Circuit Court concluded that Appellees did not owe a duty of care to Robert or Donald Patton. The Circuit Court noted generally that courts in other jurisdictions have found that "landowners" or their equivalent do not have a duty to warn invitees of the risk of lightning. As regards Donald Patton, the Circuit Court stated:

"[D]ecedent Donald Patton was a nonpaying spectator at a rugby match organized and overseen by [Appellees]. There is no indication from the record that Decedent had entrusted himself to the control and protection of [Appellees], indeed he was free to leave the tournament at any time. Additionally, there is no indication that he had lost the ability to monitor changing weather conditions and act accordingly. While [Appellants] allege the storm began near the beginning of the match, it was not until the conclusion of the game, that Decedent and plaintiff Robert Patton, attempted to escape the storm by running *towards* the tree line adjacent to the open field to retrieve their belongings. It was here that both were struck by lightning.

"The inherently unpredictable nature of weather and the patent dangerousness of lightning make it unreasonable to impose a duty upon [Appellees] to protect spectators from the type [of] injury that occurred here."

As regards Robert Patton, the Circuit Court stated that "[w]hile it is arguable that [Appellees] had a greater duty to protect plaintiff Robert Patton, a player/participant from injury, they were under no duty to protect and warn him of lightening strikes and other acts of nature." The hearing

judge relied on cases from other jurisdictions involving lightning strikes on golf courses to conclude that "lightning is a universally known danger created by the elements" and, in the absence of evidence that Appellants created a greater hazard than brought about by natural causes, there is no duty to warn and protect. The Circuit Court expressly rejected as grounds for its grant of Appellees' motions to dismiss both Maryland's Recreational Land Use Statute, and waiver argument based on language contained in Robert Patton's alleged execution of a USA Rugby Participant Enrollment Form. This appeal follows, therefore, from a dismissal of the amended complaint based solely on the ground that there was no legal duty owed to Robert or Donald Patton. Appellants present the following question for our consideration:

> Did the trial court err, when it found that Appellees had no duty to protect Appellants from lightning injuries and granted Appellees' motions to dismiss for failure to state a claim upon which relief can be granted?

## II.

Maryland Rule 2–322(b)(2) provides for the filing of a motion to dismiss for failure to state a claim upon which relief can be granted. We have stated that:

> The granting of a motion to dismiss is proper when, even if the facts and allegations as set forth in the complaint were proven to be true, the complaint would nevertheless fail to state a claim upon which relief could be granted.... [I]t will be affirmed if the record reveals any legally sound reason for the decision.

*Valentine v. On Target, Inc.,* 353 Md. 544, 548–49, 727 A.2d 947, 949 (1999) (citations omitted).

## III.

### A.

For a plaintiff to state a prima facie claim in negligence, he or she must prove the existence of four elements by

alleging facts demonstrating "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Remsburg v. Montgomery*, 376 Md. 568, 582, 831 A.2d 18, 26 (2003) (quoting *Muthukumarana v. Montgomery Co.*, 370 Md. 447, 486, 805 A.2d 372, 395 (2002), and cases cited therein). Generally, whether there is adequate proof of the required elements to succeed in a negligence action is a question of fact to be determined by the fact-finder. The existence of a legal duty, however, is a question of law to be decided by the court. *Valentine*, 353 Md. at 549, 727 A.2d at 949. As established in Maryland jurisprudence over a century ago:

there can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. It is consequently relative and can have no existence apart from some duty expressly or impliedly imposed. In every instance before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury. . . . As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or in fact; if there has been no breach of duty.

*Bobo v. State*, 346 Md. 706, 714, 697 A.2d 1371, 1375 (1997) (quoting *West Virginia Cent. & P.Ry. v. State ex rel. Fuller*, 96 Md. 652, 666, 54 A. 669, 671–72 (1903)). "[O]ur analysis of a negligence cause of action usually begins with the question of whether a legally cognizable duty existed." *Remsburg*, 376 Md. at 582, 831 A.2d at 26.

When assessing whether a tort duty may exist, we often have recourse to the definition in W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 53 (5th ed.1984), which characterizes "duty" as "an obligation, to which the law will give recognition and effect, to conform to a particular

standard of conduct toward another." *Id.* In determining the existence of a duty, we consider, among other things:

the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Ashburn v. Anne Arundel County,* 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986) (citation omitted). Where the failure to exercise due care creates risks of personal injury, "the principal determinant of duty becomes foreseeability." *Jacques v. First Nat'l Bank of Maryland,* 307 Md. 527, 535, 515 A.2d 756, 760 (1986) (citations omitted). The foreseeability test "is simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm." *Dobbins v. Washington Suburban Sanitary Comm'n,* 338 Md. 341, 348, 658 A.2d 675, 678 (1995) (quoting *Henley v. Prince George's County,* 305 Md. 320, 333, 503 A.2d 1333, 1340 (1986)). In determining whether a duty exists, "it is important to consider the policy reasons supporting a cause of action in negligence. The purpose is to discourage or encourage specific types of behavior by one party to the benefit of another party." *Valentine,* 353 Md. at 550, 727 A.2d at 950. "While foreseeability is often considered among the most important of these factors, its existence alone does not suffice to establish a duty under Maryland law." *Remsburg,* 376 Md. at 583, 831 A.2d at 26. As we clarified in *Ashburn:*

[t]he fact that a result may be foreseeable does not itself impose a duty in negligence terms. This principle is apparent in the acceptance by most jurisdictions and by this Court of the general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a "special relationship" exists either be-

tween the actor and the third person or between the actor and the person injured.

*Ashburn,* 306 Md. at 628, 510 A.2d at 1083 (citations omitted). In addition, "a tort duty does not always coexist with a moral duty." *Jacques,* 307 Md. at 534, 515 A.2d at 759 (citing W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 56 (5th ed.1984)). We have held that such a "special duty" to protect another may be established "(1) by statute or rule; (2) by contractual or other private relationship; or (3) indirectly or impliedly by virtue of the relationship between the tortfeasor and a third party." *Bobo,* 346 Md. at 715, 697 A.2d at 1376 (internal citations omitted).

### B.

Appellants allege that a "special relationship" existed between Appellees (USA Rugby, MARFU, PRU, the Referees' Society, and Steven Quigg) and Robert and Donald Patton sufficient to recognize the existence of a duty to protect the latter, the breach of which gave rise to an action for negligence. Appellants argue that:

A participant in a sporting event, by the very nature of the sport, trusts that his personal welfare will be protected by those controlling the event. Stated another way, it is reasonably foreseeable that both the player, and the player's father, will continue to participate in the match, as [ ]long as the match is not stopped by the governing bodies in charge. It also is reasonably foreseeable that, when matches are played in thunderstorms, there is a substantial risk of injury from lightning. And finally, it is reasonably foreseeable that a father will not abandon his son, when he sees those who have assumed responsibility for his son's welfare placing his son in a perilous condition. . . .

Appellants essentially contend that the tournament organizers had a duty to protect Robert and Donald, and to extricate them, from the dangers of playing in and viewing, respectively, a sanctioned rugby match during a thunderstorm.

Appellees counter that "there is no 'special relationship' between Mr. Patton, Sr., Mr. Patton and the [A]ppellees which would require the [A]ppellees to protect and warn these individuals of the dangers associated with lightning." Appellees argue that they "had no ability to control the activities of players or spectators at any time," and "there is no evidence in the record that Mr. Patton, Sr. and Mr. Patton were dependent upon or relied upon the [A]ppellees in any way, shape or form."

We said in *Remsburg* that "the creation of a 'special duty' by virtue of a 'special relationship' between the parties can be established by either (1) the inherent nature of the relationship between the parties; or (2) by one party undertaking to protect or assist the other party, and thus often inducing reliance upon the conduct of the acting party." *Remsburg,* 376 Md. at 589–90, 831 A.2d at 30. We conclude that Appellants here did not establish by either of these methods a triable issue as to the existence of a "special relationship." *Id.*

In *Remsburg,* among other issues, we focused on whether a "special relationship" was created because of an implied or indirect relationship between the parties. *Id.* We held that the leader of a hunting party was under no special duty to protect a property owner who was shot by a member of the leader's hunting party. We found insufficient the relationship of dependence between the leader of the hunting party and the injured property owner. This meant there was no duty on the part of the leader to protect the property owner from being accidentally shot by a hunting party member. 376 Md. at 593, 831 A.2d at 33. In holding that the inherent nature of the relationship between the parties did not give rise to a "special relationship" and, hence, a tort duty, we again approved the traditional "special relationships" that consistently have been associated with the "special relationship" doctrine. 376 Md. at 593–94, 831 A.2d at 32–33. We adopted previously as Maryland common law § 314A of the Restatement, entitled "Special Relations Giving Rise to a Duty to Aid or Protect," which provides that:

(1) [a] common carrier is under a duty to its passengers to take reasonable action

   (a) to protect them against unreasonable risk of physical harm . . . .

(2) An innkeeper is under a similar duty to his guests.

(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstance such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

Restatement (Second) of Torts § 314A (1965); *see Southland Corp. v. Griffith*, 332 Md. 704, 719, 633 A.2d 84, 91 (1993). Although the foregoing list is not exhaustive, our caselaw where we have found a duty arises consistently requires an element of dependence that is lacking in the present case. *See, e.g., Todd v. MTA*, 373 Md. 149, 165, 816 A.2d 930, 939 (2003) (finding that an employee of a common carrier has a legal duty to take affirmative action for the aid or protection of a passenger under attack by another passenger); *Southland*, 332 Md. at 720, 633 A.2d at 91 (finding that a convenience store, through its employee and by virtue of a special relationship between the business and its customers, owed a legal duty to a customer being assaulted in store parking lot to call the police for assistance when requested to do so).

As stated in *Remsburg*, "while we have permitted some flexibility in defining this limited exception, such as including the employer-to-employee relationship and also that of business owner-to-patron, we have been careful not to expand this class of 'special relationships' in such a manner as to impose broad liability for every group outing." *Remsburg*, 376 Md. at 594, 831 A.2d at 33. Similarly, in *Muthukumarana v. Montgomery County*, 370 Md. 447, 805 A.2d 372 (2002), we declined to recognize that a "special relationship" existed between two child victims of the sequelae of a domestic dispute and an emergency telephone operator. In *Muthukumarana*, the op-

erator, a police services aide, received a frantic call from Ms. Muthukumarana reporting that her husband had assaulted her in their house and then run upstairs. 370 Md. at 468–70, 805 A.2d at 384–86. The police services aide talked with Ms. Muthukumarana on the phone for one minute and forty seconds until the husband returned downstairs and shot and killed the two children huddled at her side and then himself. *Id.* Ms. Muthukumarana sued the police services aide and her supervisors alleging that they had a tort duty of care to the decedent children and herself and that that duty was breached by, among other things, a failure to timely advise her to leave the premises. *Id.*

In *Fried v. Archer*, the companion case to *Muthukumarana*, we also declined to find that a "special relationship" existed between a woman who died of hypothermia due to exposure to the elements and an emergency telephone system operator who erroneously reported the location of the woman to police officers on patrol who therefore failed to discover the victim before her demise. In *Fried*, a communications officer employed by the Harford County Sheriff's Office received an anonymous call[4] reporting a female laying semi-conscious in the woods behind a particular building. 370 Md. at 458, 805 A.2d at 379. The communications officer, however, provided police officers with the wrong location of the woman. 370 Md. at 460, 805 A.2d at 379. The responding officers were unable to locate the victim, who died of hypothermia. 370 Md. at 460, 805 A.2d at 380. The decedent's mother sued the communications officer and her supervisors alleging that they had a tort duty of care to the decedent and that that duty was breached by the failure to provide the police officers with the decedent's correct location. 370 Md. at 461, 805 A.2d at 380.

We applied the "special relationship" doctrine to the circumstances surrounding the emergency telephone operators in both cases and held that no "special relationship" existed

---

4. The call, it turned out, was placed by one of the young men who caused the young woman to become unconscious and placed her in the vulnerable location outdoors on a cold, rainy night.

between them and the plaintiffs. 370 Md. at 486, 805 A.2d at 395. We reasoned that for a "special relationship" to exist between an emergency telephone operator and a person in need of assistance, it must be shown that the telephone operator affirmatively acted to protect the decedent or a specific group of individuals like the decedent, thereby inducing specific reliance by an individual on the telephone operator's conduct. 370 Md. at 496, 805 A.2d at 401.

The element of dependence and ceding of self-control by the injured party that is needed under *Remsburg* and *Muthukumarana/Fried* is absent in the present case.[5] There is no credible evidence that the two adults, Robert and Donald Patton, entrusted themselves to the control and protection of Appellees. Accordingly, we follow our admonition in *Remsburg* to avoid expanding the "special relationship" exception in such a manner as to impose broad liability for every group activity. *Remsburg*, 376 Md. at 594, 831 A.2d at 33. Our decision here, in line with *Remsburg* and *Muthukumarana/Fried*, is consistent with our view of narrowly construing the "special relationship" exception.

Of the relevant cases from our sister states, we find *Dykema v. Gus Macker Enters., Inc.*, 196 Mich.App. 6, 492 N.W.2d 472 (1992) to be particularly persuasive in the present case. In *Dykema*, the Michigan Court of Appeals held that the sponsors of an outdoor basketball tournament had no duty to warn a tournament spectator of an approaching thunderstorm that ultimately caused his injury. *Dykema*, 492 N.W.2d at 474–75. A thunderstorm struck the area of the tournament. The plaintiff, while running for shelter, was struck by a falling tree limb and paralyzed. *Dykema*, 492 N.W.2d at 473.

Like Maryland, Michigan recognizes the general rule that there is no tort duty to aid or protect another in the absence

---

5. There may be a degree of dependency and ceding of control that could trigger a "special relationship" in, for example, a Little League game where children playing in the game are reliant on the adults supervising them.

of a generally recognized "special relationship." *Dykema*, 492 N.W.2d at 474. The Michigan court stated that:

> The rationale behind imposing a legal duty to act in these special relationships is based on the element of control. In a special relationship, one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is in the best position to provide a place of safety. Thus, the determination whether a duty-imposing special relationship exists in a particular case involves the determination whether the plaintiff entrusted himself to the control and protection of the defendant, with a consequent loss of control to protect himself.

*Id.* (citations omitted). Like the situation of the plaintiff and tournament sponsors in *Dykema*, Appellants here cannot be said to have entrusted themselves to the control and protection of the rugby tournament organizers. *Id.* ("Plaintiff was free to leave the tournament at anytime, and his movements were not restricted by Defendant."). We do not agree that, as Appellants argue, "the participants in the tournament, in effect, cede control over their activities to those who are putting on the event." Robert and Donald Patton were free to leave the voluntary, amateur tournament at any time and their ability to do so was not restricted in any meaningful way by the tournament organizers. An adult amateur sporting event is a voluntary affair, and the participants are capable of leaving the playing field on their own volition if they feel their lives or health are in jeopardy. The changing weather conditions in the present case presumably were observable to all competent adults. Robert and Donald Patton could have sought shelter at any time they deemed it appropriate to do so.[6]

---

**6.** The *Dykema* court continued its reasoning by assuming that, "[e]ven if [Dykema] had succeeded in establishing that a special relationship existed ... we are unable to find precedent for imposing a duty upon an organizer of an outdoor event such as this basketball tournament to

warn a spectator of approaching severe weather." *Dykema*, 492 N.W.2d at 475. Citing *Hames v. State*, 808 S.W.2d 41, 45 (Tenn.1991), the Michigan Court of Appeals alternatively held that, because the "approach of a thunderstorm is readily apparent to reasonably prudent people ... it would be unreasonable to impose a duty ... to warn ... of a condition that the spectator is fully able to observe and react to on his own." *Id.*

There is a line of cases, not dependent on analysis of whether a special relationship existed, that rely on the ability of competent adults to perceive the approach of thunderstorms and to appreciate the natural risks of lightning associated with thunderstorms to justify finding no breach of an ordinary duty of care owed to a plaintiff, whether that duty is recognized by common law, undertaken by the conduct of a defendant, or implied from the conduct of a defendant. For example, in *Hames*, the Supreme Court of Tennessee held that the State's failure to provide lightning proof shelters and lightning warning devices at a State-owned golf course was not actionable in negligence. *Hames*, 808 S.W.2d at 45. Like Robert and Donald Patton, the golfer in *Hames* began to play his sport of choice on an overcast day. On the day that the golfer was struck by lightning, no signs were posted informing patrons what to do in the event of a thunderstorm and no effort was made to clear the golf course by course employees. *Hames*, 808 S.W.2d at 42. Approximately 25 minutes after the golfer began to play golf, a thunderstorm moved through the area. He was struck and killed by lightning while seeking cover on a small hill underneath some trees.

The plaintiff in *Hames* argued that the U.S. Golf Association's Rules and Regulations created a golf course standard of care that required posting of lightning warnings and precautions. *Hames*, 808 S.W.2d at 43. The plaintiff's argument in *Hames* is analogous to Appellants' argument in the present case, i.e., the National Collegiate Athletic Association guidelines constitute a lightning safety standard of care for outdoor sporting events.

As well as finding no proximate cause, the Tennessee Court found that the "risks and dangers associated with playing golf in a lightning storm are rather obvious to most adults." *Hames*, 808 S.W.2d at 45. The Court noted that it would have taken the decedent golfer two minutes to reach the relative safety of the clubhouse, but instead he remained on the golf course. *Id.* The Court concluded that "it is reasonable to infer that a reasonably prudent adult can recognize the approach of a severe thunderstorm and know that it is time to pack up the clubs and leave before the storm begins to wreak havoc." *Id.* Accordingly, even though the State, as owner-operator of the golf course, owed Hames a general duty "to exercise reasonable care under all the attendant circumstances to make the premises safe ... the defendant's conduct did not fall below the applicable standard of care." *Hames*, 808 S.W.2d at 44–46.

In *Caldwell v. Let the Good Times Roll Festival*, 717 So.2d 1263, 1274 (La.Ct.App.1998), the Louisiana Court of Appeals held that the City of Shreveport and two co-sponsors of an outdoor festival had neither a general nor specific duty to warn spectators of an approaching severe

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**

Chief Judge BELL joins in the judgment only.

thunderstorm that caused injuries due to its high winds. The court in *Caldwell* observed that:

> Most animals, especially we who are in the higher order, do not have to be told or warned about the vagaries of the weather, that wind and clouds may produce a rainstorm; that a rainstorm and wind and rain may suddenly escalate to become more severe and dangerous to lives and property. A thundershower may suddenly become a thunderstorm with destructive wind and lightning. A thunderstorm in progress may escalate to produce either or both tornadoes and hail, or even a rare and unexpected micro burst ... all of which are extremely destructive to persons and property.

*Caldwell*, 717 So.2d at 1271. *See also Seelbinder v. County of Volusia*, 821 So.2d 1095, 1097 (Fla.Dist.Ct.App.2002) ("We begin by joining the almost universally agreed view that the County, in its capacity as 'landowner' or the equivalent, did not have a duty to warn invitees, including beachgoers that there was a risk of being struck by lightning.") (citations omitted); *Grace v. City of Oklahoma City*, 953 P.2d 69, 71 (Okl.Civ.App.1997) ("Lightning is a universally known danger created by the elements. [The golf course owner] has no duty to warn its invitees of the patent danger of lightning or to reconstruct or alter its premises to protect against lightning[,]" and "all persons on the property are expected to assume the burden of protecting themselves from them."); *McAuliffe v. Town of New Windsor*, 178 A.D.2d 905, 906, 577 N.Y.S.2d 942 (N.Y.App.Div.1991) (upon the commencement of rain and thunder, the danger of lightning was admittedly apparent to plaintiff and there is no special duty to warn a specific swimmer against a condition that is readily observable by the reasonable use of one's senses). The reasoning in the foregoing cases, although not explicated in terms of special relationship analysis as such, is consistent with the result reached in the present case.