879 A.2d 1088

**Jane DOE**

v.

**PHARMACIA & UPJOHN COMPANY, INC.**

**Misc. No. 13, Sept. Term, 2004.**

Court of Appeals of Maryland.

Aug. 11, 2005.

408

Stephen B. Mercer (Rene Sandler of Sandler & Mercer, P.C., Rockville; Thomas Mack of the University of the District of Columbia, Washington, DC), on brief, for appellant.

Stephen E. Marshall (Paul F. Strain, Mitchell Y. Mirviss and Mark D. Maneche of Venable, LLP, Baltimore), on brief, for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, J.

In this Certified Question case, pursuant to the Maryland Uniform Certification of Questions of Law Act, Maryland Code (1974, 2002 Repl.Vol., 2004 Cum.Supp.), §§ 12–601 through 12–613 of the Courts and Judicial Proceedings Article, and Maryland Rule 8–305, the United States Court of Appeals for the Fourth Circuit has certified the following questions of Maryland law:

"(1) For purposes of a negligence cause of action, does a commercial manufacturer of two strains of HIV ('HIV–1' and 'HIV–2'), which conducts blood tests on its employees who have been exposed to HIV while on the job, and which manufactures test kits for HIV–1, owe a legal duty to its employees' spouses to exercise reasonable care in conducting testing, including testing for both strains of the virus?"

"(2) For purposes of a negligence or negligent misrepresentation cause of action, does a commercial manufacturer of two strains of HIV ('HIV–1' and 'HIV–2'), which conducts blood tests of its employees who have been exposed to HIV while on the job, owe a legal duty to its employees' spouses to exercise reasonable care in informing the employees of the nature of the test results, including the fact that a 'false positive' test result for HIV–1 may indicate an HIV–2 infection?"

Our answer to both of these questions shall be NO.[1]

## I.

We recite the facts as set out in the Certification Order.

"Jane Doe has been married to, and living as husband and wife with, John Doe since 1971. Between 1974 and 1991, John Doe was employed by Pharmacia as a laboratory technician at its Montgomery County, Maryland, viral production facility. Pharmacia cultivated pathogens at this facility for use in diagnostic test strips manufactured and sold by Pharmacia and others. John Doe's primary job responsibilities included the daily feeding, growing, and harvesting of pathogens for large scale propagation. Pharmacia closed this facility in 1991.

"In 1984, researchers discovered that the primary causative viral agent of acquired immune deficiency syndrome ('AIDS') is HIV. By 1986, two types of HIV, designated as 'HIV–1' and 'HIV–2,' had been discovered. The first reported case of HIV–2 in the United States was in 1987, and there have been few reported HIV–2 cases in the United States. Both HIV-1 and HIV–2 have the same modes of transmission and are associated with AIDS. Compared with persons infected with HIV–1, those with HIV–2 are less infectious early in the course of infection.

"Beginning in 1984, approximately 80% of the viral production at the Pharmacia facility where John Doe worked was HIV–1 and HIV–2. Pharmacia cultivated and harvested HIV cultures on a daily basis and shipped them to another facility for incorporation into a test for HIV antibodies. Between 1985 and 1991, John Doe was exposed to high concentrations of HIV–1 and HIV–2 while on the job.

"At some point around 1985, Pharmacia (through its agent) began testing its employees, including John Doe, who

---

1. Because in deciding that there is no duty of care on the part of Pharmacia we need not reach the specific details that differentiate the questions certified to us today, we shall discuss and respond to the two certified questions as one.

were exposed to HIV in the workplace every six months. Pharmacia manufactured the test strips that were used in this testing. Although Pharmacia was aware of the existence of HIV–2, commercial test kits were not available in the United States to test for an injurious exposure to HIV–2 before 1991 because of the statistically insignificant incidence of the virus. Therefore, Pharmacia's testing was limited to detection of HIV–1. However, Pharmacia possessed the materials, knowledge, and capability to manufacture its own test strips to detect HIV–2.

"The testing conducted by Pharmacia consisted of a two-part protocol whereby an initial screen (the Elisa test) would, if positive, be followed by a confirmatory test (the Western Blot) for HIV–1. By 1989, Pharmacia was aware that the HIV tests being used would detect core proteins present in both HIV–1 and HIV–2, and that while the HIV–2 proteins (among other factors) could cause a positive result on the Elisa test, the Western blot test would confirm only the presence of HIV–1. Thus, as of 1989, a person infected with HIV–2 could test positive on the Elisa test but negative on the Western blot test. This type of result was considered to be a 'false positive' for HIV–1.

"John Doe consistently tested negative until 1989, when he received a positive result on the Elisa test. John Doe was retested, and the result was negative. John Doe's subsequent tests were negative.

"Pharmacia did not counsel or warn either John Doe, Jane Doe, or its testing agent about the potential negative ramifications of a 'false positive' test. However, Pharmacia (and/or its agent) did tell John Doe after the 'false positive' test that the Western Blot test failed to confirm the presence of HIV–1; that the test result could have been caused by factors unrelated to exposure to HIV; that the test result did not indicate that he was infected with the virus that causes AIDS; and that the test result did not indicate a significant risk to his health. Neither Jane Doe nor John Doe was aware that a 'false positive' test could indicate an HIV–2 infection.

"In October 2000, John Doe was admitted to the hospital where he was found to be suffering from multiple AIDS-like conditions. Although John Doe tested negative for HIV–1, he tested positive for HIV–2 and was diagnosed as having AIDS. John Doe became infected with HIV–2 while handling the virus as a Pharmacia employee.

"Upon learning that he was infected with HIV–2, John Doe immediately informed Jane Doe. Subsequent testing of Jane Doe revealed that she also is infected with HIV–2. Jane Doe was John Doe's only sexual partner and was known as such by Pharmacia. Jane Doe became infected with HIV–2 because of unprotected marital relations with John Doe. The Does would not have engaged in unprotected marital relations had they been aware that John Doe was infected with HIV–2.

"Pharmacia was aware at times pertinent to this case that HIV–2 was a pathogen that could have significant consequences, including death for humans, and that it could be transmitted by sexual contact and exchange of body fluids. Pharmacia also knew that the spread of HIV–2 between sexual partners could be effectively prevented through behavior modification and the use of barrier devices. Pharmacia also learned, subsequent to the conclusion of John Doe's employment, that at least one co-worker of John Doe's at the Montgomery County facility had unexpectedly become infected with one or more lethal pathogens that had been propagated in that facility; however, despite having this knowledge, Pharmacia did not warn the Does of any danger." (Citations and footnotes omitted.)

II.

Jane Doe filed a tort action in the Circuit Court for Montgomery County against Pharmacia & Upjohn Company, Inc. ("Pharmacia"). Pharmacia removed the case to the United States District Court for the District of Maryland and subsequently filed a motion to dismiss pursuant to Fed. Rule Civ. Pro. 12(b)(6). Ms. Doe amended her complaint to allege nine

claims, including five claims sounding in negligence.[2] Pharmacia moved to dismiss the amended complaint. Following a hearing, the District Court dismissed the complaint with prejudice.

Doe appealed to the United States Court of Appeals for the Fourth Circuit. On appeal, Doe contended that the District Court erred in holding that under Maryland law Pharmacia did not owe her a duty of care. The Court of Appeals for the Fourth Circuit certified the questions of law to this Court.

### III.

Ms. Doe argues before this Court that Pharmacia owed her a duty of care as the spouse of an employee who had a foreseeable risk of contracting HIV from her husband. Pharmacia should have known, Ms. Doe contends, that Mr. Doe was or could have been infected with the HIV Pharmacia manufactured and that he risked transmitting the disease to his wife. Doe also contends that Pharmacia was morally blameworthy in manufacturing a legal human pathogen for commercial purposes and in failing to inform Mr. Doe that he was infected. Finally, Ms. Doe claims that the interests of society in protecting public health and limiting the spread of disease are furthered by imposing a duty of care on Pharmacia, the entity in a position to prevent further contamination and spread of disease.

Pharmacia maintains that it did not owe a duty of care to Ms. Doe. Pharmacia argues that the relationship between it and Ms. Doe, the wife of its employee, is too attenuated for the company to be burdened with a tort duty. In response to Ms. Doe's position, Pharmacia notes that foreseeability alone is not sufficient to establish a legal duty. Pharmacia argues further that if it were to owe a duty of care to Ms. Doe, then it

---

**2.** The five causes of action grounded in negligence that Ms. Doe filed are as follows: negligent operation of an HIV production facility; negligent failure to rule out an HIV–2 infection; negligent failure to test for HIV–2; negligent failure to warn of cross reactivity; and negligent misrepresentation.

would owe a duty to an indeterminate number of people, stretching tort duty beyond manageable bounds.

### IV.

 Ms. Doe's causes of action all sound in negligence. In Maryland, to state a claim of negligence, a party must allege and prove facts demonstrating "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Dehn v. Edgecombe*, 384 Md. 606, 619, 865 A.2d 603, 611 (2005); *Horridge v. Social Services*, 382 Md. 170, 182, 854 A.2d 1232, 1238 (2004); *Patton v. USA Rugby*, 381 Md. 627, 635–36, 851 A.2d 566, 570 (2004). Ordinarily, we begin our analysis of a negligence action with the question of whether a legally cognizable duty exits. *Patton*, 381 Md. at 636, 851 A.2d at 571; *Remsburg v. Montgomery*, 376 Md. 568, 582, 831 A.2d 18, 26 (2003). The certified question raises only the issue of duty, and, thus, our sole focus in this case is on whether Pharmacia had a legal duty to protect Ms. Doe from injury or harm by exercising reasonable care in testing Mr. Doe and by warning him of the possibility that he had contracted HIV–2.

 The existence of a legal duty is a question of law, to be decided by the court. *Dehn*, 384 Md. at 619–20, 865 A.2d at 611; *Patton*, 381 Md. at 636, 851 A.2d at 570; *Hemmings v. Pelham Wood*, 375 Md. 522, 536, 826 A.2d 443, 451 (2003). For over a century, this Court has explained the rationale for the duty requirement as follows:

"[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. It is consequently relative and can have no existence apart from some duty expressly or impliedly imposed. In every instance before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the

injury.... As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or in fact; if there has been no breach of duty."

*W. Va. Central R. Co. v. State ex rel. Fuller*, 96 Md. 652, 666, 54 A. 669, 671–72 (1903); *accord Patton*, 381 Md. at 636, 851 A.2d at 570–71; *Bobo v. State*, 346 Md. 706, 714, 697 A.2d 1371, 1375 (1997); *Ashburn v. Anne Arundel County*, 306 Md. 617, 626–27, 510 A.2d 1078, 1083 (1986).

■ Duty is "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Dehn*, 384 Md. at 619, 865 A.2d at 611 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53 (5th ed.1984)); *Patton*, 381 Md. at 636–37, 851 A.2d at 571 (same). There is no set formula for the determination of whether a duty exists. *Coates v. Southern Md. Electric*, 354 Md. 499, 509, 731 A.2d 931, 936 (1999); *Ashburn*, 306 Md. at 627, 510 A.2d at 1083. We have applied a "foreseeability of harm" test, "which is based upon the recognition that duty must be limited to avoid liability for unreasonably remote consequences." *Coates*, 354 Md. at 509, 731 A.2d at 936 (quoting *Rosenblatt v. Exxon*, 335 Md. 58, 77, 642 A.2d 180, 189 (1994)). We also have looked at the relationship of the parties. *See Dehn*, 384 Md. at 619, 865 A.2d at 611 (describing duty as "based upon a relationship between the actor and the injured person"); *Coates*, 354 Md. at 509, 731 A.2d at 936 (stating that the relationship of the parties is "inherent ... in the concept of duty"); 1 Dan B. Dobbs, *The Law of Torts* § 229 (2001) (stating that "[r]elationship of the parties is so pervasively important in determining existence and measure of duty that it often goes unmentioned").

■■ At its core, the determination of whether a duty exists represents a policy question of whether the plaintiff is entitled to protection from the defendant. *See Rosenblatt*, 335 Md. at 77, 642 A.2d at 189 (stating that "ultimately, the

determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interests are, or are not, entitled to legal protection against the conduct of the defendant"); *Ashburn,* 306 Md. at 627, 510 A.2d at 1083 (quoting Keeton et al., *supra,* at § 53 as commenting that duty "is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection"); Dobbs at § 229 (quoting Keeton et al., *supra,* at § 54 and stating that "duty should be constructed by courts from building blocks of policy and justice"). Accordingly, we have articulated the following non-exhaustive list for balancing the policy considerations inherent in the determination of whether a duty exists:

> "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved."

*Patton,* 381 Md. at 637, 851 A.2d at 571 (quoting *Ashburn,* 306 Md. at 627, 510 A.2d at 1083 (citations omitted)). In cases involving personal injury, "the principal determinant of duty becomes foreseeability." *Jacques v. First Nat'l Bank,* 307 Md. 527, 535, 515 A.2d 756, 760 (1986).

In reviewing the underlying grant of a motion to dismiss, we must assume the truth of the well-pleaded factual allegations of the complaint, as well as the reasonable inferences that may be drawn from those allegations. *Horridge,* 382 Md. at 175, 854 A.2d at 1234–35. Assuming the accuracy of the allegations within the complaint, Pharmacia manufactured HIV–2. As a laboratory technician for Pharmacia, Mr. Doe was exposed to high concentrations of HIV–2. It was foreseeable that Mr. Doe could contract HIV–2. As HIV–2 can be transmitted through sexual relations, it should have been

foreseeable to Pharmacia that Mr. Doe's wife could contract the virus.

That the injury to Ms. Doe may have been foreseeable does not end our inquiry. We have stated consistently that foreseeability *alone* is not sufficient to establish duty. *See Dehn,* 384 Md. at 624, 865 A.2d at 614 (stating that "mere foreseeability of harm or injury is insufficient to create a legally cognizable special relationship giving rise to a legal duty to prevent harm"); *Remsburg,* 376 Md. at 583, 831 A.2d at 26 (stating that "[w]hile foreseeability is often considered among the most important of these factors, its existence alone does not suffice to establish a duty under Maryland law"); *Valentine v. On Target,* 353 Md. 544, 551, 727 A.2d 947, 950 (1999) (noting that "not all foreseeable harm gives rise to a duty; there are other factors to consider"); *Ashburn* 306 Md. at 628, 510 A.2d at 1083 (stating that "[t]he fact that a result may be foreseeable does not itself impose a duty in negligence terms").

Neither party has identified and we could not find any Maryland case holding that an employer has a duty to the spouse of an employee. In *Dehn v. Edgecombe,* 384 Md. 606, 865 A.2d 603 (2005), a medical malpractice case, we considered a similar assertion to the one made by Doe and held that there was no duty. Mr. Dehn underwent a vasectomy. According to Mr. Dehn, his primary care physician advised him that he could resume engaging in unprotected intercourse with his wife without fear of pregnancy, despite the fact that requisite tests had yet to be performed. Mrs. Dehn subsequently became pregnant and sued her husband's primary care physician, claiming that the physician had negligently counseled her husband. We addressed the question of "whether Maryland recognizes an independent cause of action in a patient's wife against a doctor who acted negligently while treating her husband but who had no relationship or direct interaction with the wife." *Id.* at 610, 865 A.2d at 605.

We held that the doctor owed no duty of care to Mrs. Dehn, and, therefore, Mrs. Dehn did not have an independent cause

of action in negligence against the doctor. *See id.* at 622, 865 A.2d at 612. We reviewed Maryland case law on negligence involving physicians and third parties and concluded "that although the common law does not foreclose the possibility of imposing a duty of care in the absence of a doctor-patient relationship to a third party who never received treatment from the doctor, it will not do so except under extraordinary circumstances." *Id.* at 621, 865 A.2d at 612. We quoted with approval the following reasoning and conclusion from the opinion of the Court of Special Appeals:

> "There was no direct doctor-patient relationship between Dr. Edgecombe and Mrs. Dehn. The two of them had never met or spoken to each other until the day of the trial. Dr. Edgecombe was Mr. Dehn's primary health care provider, not Mrs. Dehn's. Mr. Dehn, not Mrs. Dehn, was in the health care program that involved Dr. Edgecombe.... If a duty of care owed by Dr. Edgecombe to Mrs. Dehn is to be found, therefore, its source must be somewhere other than in a doctor-patient relationship *per se* between the two of them."

*Id.* at 622, 865 A.2d at 612–13 (quoting 152 Md.App. 657, 681, 834 A.2d 146, 159–60 (2003)).

We rejected the argument advanced by Mrs. Dehn that the foreseeability of harm resulted in a special relationship sufficient to impose a duty of care in the absence of a traditional tort duty. *See id.* at 625, 865 A.2d at 614. Dehn pointed to the foreseeability that negligence in the care of her husband's vasectomy would result in her pregnancy and argued that the foreseeability was sufficient to create a duty. We noted our case law, discussed *supra*, holding that the existence of foreseeability alone is not sufficient to establish a duty. *See id.* We then noted that Dehn could not have relied on the doctor's comments to her husband, because the doctor had not performed the vasectomy or provided post-operative care and the doctor had never met Mrs. Dehn prior to trial. *See id.* at 626–27, 865 A.2d at 615.

Finally, we stated our unwillingness to "impose a legal duty on Dr. Edgecombe with regard to Mrs. Dehn based simply on his alleged awareness that Mr. Dehn was married." *Id.* at 627, 865 A.2d at 615. We rejected Mrs. Dehn's position, reasoning that imposing a duty of care to Mrs. Dehn would create an expansive new duty. We stated as follows:

> "A duty of care does not accrue purely by virtue of the marital status of the patient alone; some greater relational nexus between doctor and patient's spouse must be established, if it can be established at all, and here it was not. A duty of care to a non-patient is not one which Maryland law is prepared to recognize under these circumstances. The imposition of a common law duty upon Dr. Edgecombe to the wife under these circumstances could expand traditional tort concepts beyond manageable bounds. The rationale for extending the duty would apply to all potential sexual partners and expand the universe of potential plaintiffs.... Based on these rationales alone, a family practitioner who ostensibly provides after-care following a sterilization procedure performed by another physician would owe a duty of care not just to the patient who underwent the operation but every sexual partner the patient encounters after the operation—a possibility the law does not countenance."

*Id.* at 627, 865 A.2d at 615.

Our reasoning in *Dehn* applies with equal force to the case *sub judice.*[3] While the present case does not involve a doctor-

---

**3.** Ms. Doe does not claim that a special relationship existed between Pharmacia and herself. We have held that there is no duty to control the conduct of a third person so as to prevent personal harm to another, unless a "special relationship" exists between the actor and the third person or between the actor and the person injured. *See Patton v. USA Rugby,* 381 Md. 627, 637–38, 851 A.2d 566, 571 (2004); *Ashburn v. Anne Arundel County,* 306 Md. 617, 628, 510 A.2d 1078, 1083 (1986); Restatement (Second) of Torts § 315 (1965). The creation of a "special duty" through a "special relationship" between the parties can be established either by "(1) the inherent nature of the relationship between the parties; or (2) by one party undertaking to protect or assist the other party, and thus often inducing reliance upon the conduct of the acting party." *Remsburg v. Montgomery,* 376 Md. 568, 589–590, 831 A.2d 18, 30 (2003). Neither basis for a special

patient relationship, the asserted obligation of Pharmacia is similar. Pharmacia had the responsibility, according to Ms. Doe, to inform Mr. Doe of the meaning of the laboratory test results for his health and the implications of the results for his future conduct. In this context, an employer could owe a duty to a third party only in extraordinary circumstances. Such extraordinary circumstances do not exist in this case. Ms. Doe had no relationship with Pharmacia. There is no assertion in the complaint that she was ever an employee of Pharmacia, that she had ever been tested for HIV or any other disease by Pharmacia, or that she had ever had any contact with Pharmacia.

Doe's proposed duty of care to her would create an expansive new duty to an indeterminate class of people. This Court has resisted the establishment of duties of care to indeterminate classes of people. *See Dehn,* 384 Md. at 627, 865 A.2d at 615 (stating that "[t]he imposition of a common law duty upon Dr. Edgecombe to the wife under these circumstances could expand traditional tort concepts beyond manageable bounds"); *Walpert v. Katz,* 361 Md. 645, 671, 762 A.2d 582, 596 (2000) (concluding that the rationale for the privity requirement in negligence cases involving economic harm is to avoid liability to an indeterminate class); *Valentine,* 353 Md. at 553, 727 A.2d at 951 (stating that "[t]he class of persons to whom a duty would be owed under these bare facts would encompass an indeterminate class of people, known and unknown"); *Village of Cross Keys v. U.S. Gypsum,* 315 Md. 741, 744–45, 556 A.2d 1126, 1127 (1989) (stating that the claim of a tort duty "generates the specter of 'liability in an indeterminate amount for an indeterminate time to an indeterminate class,' a liability that concerned Justice Cardozo in *Ultramares Corporation v.*

---

relationship exists in this case. First, there is no special relationship inherent in the nature of the relationship between an employer and the spouse of an employee. Second, Doe does not allege that Pharmacia undertook to protect or assist her. Indeed, there is no indication of any interaction between Pharmacia and Ms. Doe before Ms. Doe commenced this suit.

*Touche,* 255 N.Y. 170, 174 N.E. 441, 444 (1931), and continues to concern courts today").

The concern with recognizing a duty that would encompass an indeterminate class of people is that a person ordinarily cannot foresee liability to a boundless category of people. *See Walpert,* 361 Md. at 671, 762 A.2d at 596 (explaining the limitation of duty as aimed at "limit[ing] the defendant's risk exposure to an actually foreseeable extent, thus permitting a defendant to control the risk to which the defendant is exposed"). Additionally, we have noted that the imposition of a duty to an indeterminate class would make tort law unmanageable. *See Dehn,* 384 Md. at 627, 865 A.2d at 615.

The imposition of a duty of care in this case would create an indeterminate class of potential plaintiffs. Doe portrays her proposed duty as limited to spouses. She claims that it was foreseeable that she would contract HIV while engaging in unprotected sex with her husband because it is foreseeable that a husband and wife will engage in sexual relations. Doe does not offer any legitimate reason to support a distinction between married plaintiffs and other plaintiffs. The rationale for imposing a duty of care to Ms. Doe could apply to all sexual partners of employees. *See id.* (declining to impose a duty of care based on the foreseeability that spouses would engage in sexual relations because "[t]he rationale for extending the duty would apply to all potential sexual partners and expand the universe of potential plaintiffs"). The potential class to whom Pharmacia would owe a duty under Doe's theory is even greater than all sexual partners of its employees. It includes any person who could have contracted HIV–2 from the employee by any means. The law does not countenance the imposition of such a broad and indeterminate duty of care.

In *Adams v. Owens–Illinois,* 119 Md.App. 395, 705 A.2d 58 (1998), the Court of Special Appeals applied the same policy of avoiding expansive new duties to hold that an employer owed no duty to the wife of its employee. A woman died from asbestosis, which she allegedly contracted from handling and

washing her husband's clothing. The woman's estate sued her husband's employer for negligence. On appeal of an adverse jury finding, the estate claimed error in the refusal of the trial court to instruct the jury on the duty of care owed by the employer to the employee. The intermediate appellate court affirmed, holding that the duty of care owed to the employee was not relevant to consideration of the injury to the wife. *Id.* at 411, 705 A.2d at 66. The court reasoned that the plaintiff's position would create an overly broad notion of duty. If liability were to rest on the wife's handling of her husband's clothing, the employer would owe a duty to anyone who had close contact with its employee. *Id.*

Doe emphasizes two other factors to support the imposition of a duty of care. Doe asserts that Pharmacia was morally blameworthy, because it manufactured a lethal human pathogen for commercial purposes, it knew that Mr. Doe was infected, and it did not inform him of that fact. Ms. Doe acknowledges in her complaint that Pharmacia was engaged in the legal production of HIV, that the pathogens produced by Pharmacia were utilized by research entities such as the National Institute of Health, and that Mr. Doe voluntarily sought employment at Pharmacia. The alleged failure of Pharmacia to inform Mr. Doe of the possibility that the "false positive" could have indicated that he was infected with HIV–2 may support a finding of negligence against him. It does not support moral blameworthiness or a duty of care to Ms. Doe.

Doe argues that there is a strong public policy to avoid the spread of a highly communicable lethal human disease and to require the people or entities that are in a position to stop the spread of a disease to do so. Undoubtedly, Doe has articulated a valid and important public policy. There is no indication, however, that the policy applies to this case. According to Doe's amended complaint, Pharmacia knew at the time it manufactured the HIV–1 test strips that certain antibodies to conditions other than HIV, including antibodies produced by pregnancy and other medical conditions, could cause a false positive Elisa test result. HIV–2 was one of a number of potential causes of a false positive. There was no test for

HIV–2 available at the time, although, according to the allegations in the complaint, Pharmacia could have created a test for HIV–2. Additionally, Mr. Doe continued to have routine HIV tests following the false positive and never again had a false positive on the Elisa test. Thus, according to the facts alleged in the amended complaint, this is not a case in which an actor, such as a doctor, knew or should have known that an unsuspecting person had or was likely to have a disease and failed to advise that person or a third party to avoid transmission of the contagion. *See, e.g., DiMarco v. Lynch Homes–Chester County, Inc.,* 525 Pa. 558, 583 A.2d 422, 424 (1990) (citing the public policy concern of avoiding the spread of communicable diseases in a case concerning a physician who allegedly misadvised a patient exposed to hepatitis as to the proper time period to abstain from sexual activity); *Skillings v. Allen,* 143 Minn. 323, 173 N.W. 663, 664 (1919) (citing public policy and holding that a physician had a duty to the parents who contracted scarlet fever from their daughter after the physician advised them that the disease was not communicable).

We conclude that the employer, in the circumstances of this case, owed no tort duty to the spouse of its employee. Accordingly, we answer the certified questions in the negative.

*CERTIFIED QUESTIONS OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE EQUALLY DIVIDED BY THE PARTIES.*