69 A.3d 1028

**GEORGIA PACIFIC, LLC, f/k/a Georgia–Pacific Corporation**

v.

**Jocelyn A. FARRAR.**

**No. 102, Sept. Term, 2012.**

Court of Appeals of Maryland.

July 8, 2013.

Reconsideration Denied Aug. 15, 2013.

James L. Shea (Mitchell Y. Mirviss and David S. Gray of Venable, LLP, Baltimore, MD; F. Ford Loker, Jr. and Robin Silver of Miles & Stockbridge, P.C., Baltimore, MD), on brief, for Petitioner.

Mark A. Behrens, Esquire, Christopher E. Appel, Esquire, Shook, Hardy & Bacon, L.L.P., Washington DC, William L. Anderson, Esquire, Rebecca C. Baden, Esquire, Crowell & Moring, LLP, Washington, DC, for Amici Curiae brief of Coalition for Litigation Justice, Inc., Chamber of Commerce of the United States of America, National Association of Manufacturers, American Insurance Association, Property Casualty Insurers Association of America, American Petroleum Institute, American Chemistry Council, Alliance of Automobile Manufacturers, and NFIB Small Business Legal Center in support of Petitioner.

Hugh F. Young, Jr., Esquire, Product Liability Advisory Council, Inc., Reston, VA, Terri S. Reiskin, Esquire, Dykema Gossett PLLC, Washington, DC, for Amicus Curiae brief of Product Liability Advisory Council, Inc. in support of Defendant–Petitioner Georgia–Pacific, LLC.

Neil J. MacDonald, Esquire, MacDonald Law Group, LLC, Beltsville, MD, Nicholas P. Vari, Esquire, Michael J. Ross, Esquire, Gregory T. Sturges, Esquire, K & L Gates, LLP, Pittsburgh, PA, for Amicus Curiae brief of Crane Co. in support of Petitioner.

Theodore Hadzi–Antich, Esquire, Deborah J. La Fetra, Esquire, Pacific Legal Foundation, Sacramento, CA, for Amicus Curiae brief of Pacific Legal Foundation in support of Petitioner Georgia–Pacific, LLC.

Edward J. Lilly (Thomas P. Kelly, William G. Minkin and Jennifer L. Lilly of The Law Offices of Peter G. Angelos, P.C., Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J.,* HARRELL, BATTAGLIA, GREENE, BARBERA, McDONALD and ALAN M. WILNER (Retired, specially assigned), JJ.

WILNER, J.

This is another in a growing line of cases in which a household member contracted mesothelioma, allegedly from exposure to asbestos fibers brought into the home on the clothing of another household member who was exposed to asbestos-laden products in the course of his employment. It raises an issue, however, not previously considered by this Court.

The plaintiff in this case is Jocelyn Farrar. From the time she was a baby in the early 1950s until she married in 1974, she lived with other family members in her grandparents' home. Her grandfather, John Hentgen, was a mechanic in the construction industry who, beginning in 1925 and extending into the 1970s, worked directly with or in the vicinity of asbestos-laden products. At least for part of that time, Mr. Hentgen wore street clothes to and from work, but at the job site he would change into work clothes, which he kept bundled up in his car during the week and brought into the home at the end of the week to be washed. During her teenage years in the 1960s, Ms. Farrar and her sister shared the task of shaking out Mr. Hentgen's work clothes, which were covered with asbestos-laden dust, laundering them, and sweeping the dust from the floor. The washing machine was in the basement, which is where Ms. Farrar said she spent most of her time. In 2008, Ms. Farrar was diagnosed with mesothelioma.

The case against Georgia Pacific was linked especially to a six or seven-month period in 1968–69, when Mr. Hentgen worked on a construction project at the Forrestal Building in Washington, D.C. His job was insulating pipes, which did not involve the use of any Georgia Pacific product. He was in the

---

* Bell, C.J., participated in the hearing of the case, in conference in regard to its decision and in the adoption of the opinion, but he had retired from the Court prior to the filing of the opinion.

immediate vicinity, however, of workers installing drywall, who applied and then sanded the Georgia Pacific Ready–Mix joint compound to smooth the joints between the drywall slabs. During that period, Ready–Mix contained asbestos, and the sanding created a great deal of dust that got on Mr. Hentgen's clothes, hair, and skin. Although, as noted, he changed his clothes before going home, he did not shower until bedtime.

Following her diagnosis of mesothelioma, Ms. Farrar filed suit in the Circuit Court for Baltimore City against more than 30 defendants, including Georgia Pacific. By the time of trial, only her strict liability and negligence claims against Georgia Pacific and its cross-claims against three settling defendants remained at issue. Following a two-week trial, the jury returned a substantial verdict in Ms. Farrar's favor. After various adjustments, a judgment was entered against Georgia Pacific for over $5 million.

Georgia Pacific had moved for judgment in its favor based, in part, on the lack of a duty to warn Ms. Farrar of the danger from its product, which the court denied. Following the verdict, the court denied the company's motion for judgment NOV. Georgia Pacific appealed, claiming both that it had no duty to warn Ms. Farrar and that the evidence was legally insufficient to establish that its Ready–Mix product was a substantial contributing factor in causing Ms. Farrar's meso-thelioma. Rejecting both claims, the Court of Special Appeals affirmed the circuit court judgment, *Georgia–Pacific v. Farrar*, 207 Md.App. 520, 53 A.3d 424 (2012).

We granted *certiorari* to review the intermediate appellate court's judgment. We shall reverse that judgment on the ground that, at the relevant time, there was no duty to warn persons such as Ms. Farrar, and we therefore need not address the second issue of whether the evidence sufficed to show that exposure to asbestos fibers emanating from the Ready–Mix product was a substantial contributing cause of Ms. Farrar's mesothelioma.

Georgia Pacific states the issue as "whether product manufacturers owe a duty to warn the 'bystander of a bystander'—a person who never used the product, who never was a bystander to the product's use, who never came into contact with the product, and who was a stranger to the manufacturer ..." Relying largely on *Gourdine v. Crews*, 405 Md. 722, 955 A.2d 769 (2008), *Doe v. Pharmacia*, 388 Md. 407, 879 A.2d 1088 (2005), *Dehn v. Edgecombe*, 384 Md. 606, 865 A.2d 603 (2005), and *Adams v. Owens–Illinois, Inc.*, 119 Md.App. 395, 705 A.2d 58 (1998), Georgia Pacific contends that:

(1) the existence of a duty is determined, as a matter of law, by weighing the relationship between the parties, the foreseeability of injury, and the defendant's ability to identify and reasonably warn the universe of individuals potentially at risk;

(2) foreseeability of harm alone is not a dispositive factor; and

(3) imposition of a duty that runs to an indeterminate class that lacks any relationship with the defendant is not favored.

Georgia Pacific argues that it had no relationship with Ms. Farrar, that she never used its product or was a bystander to its use, that its product was not a direct cause of her injury, and that it had no ability or duty to identify and warn her.

The plaintiff argues that the cases relied on by Georgia Pacific are irrelevant to product liability claims. *Adams, Doe,* and *Dehn,* she points out, involved either an employer/employee or a doctor/patient relationship, and the Court merely held that any duty from the employer or doctor extended no farther than to the employee or patient and not to a spouse of the employee or patient. *See* also *Barclay v. Briscoe,* 427 Md. 270, 47 A.3d 560 (2012). She finds *Gourdine* inapplicable because the plaintiff there was not injured by the product itself but rather by an individual who had ingested the product. Product liability claims, the plaintiff asserts, are different. They are governed by the principles set forth in *Moran v. Faberge, Inc.,* 273 Md. 538, 332 A.2d 11 (1975), *Eagle–Picher v. Balbos,* 326 Md. 179, 604 A.2d 445 (1992), and *Anchor Packing v. Grimshaw,* 115 Md.App. 134, 692 A.2d 5

(1997), which extend a duty to warn to anyone within the general field of danger who may come into contact with the product. The Court of Special Appeals accepted that approach, which undergirded its conclusion that a duty to warn existed in this case.

We believe that both lines of cases are relevant. They all dealt with an alleged breach of a duty to warn, which sounded in negligence and involved two determinations—the nature and elements of the concept of "duty" in tort law, and how those elements interacted with the elements of the particular tort in the context of the relationship between the parties. There is a commonality in the first determination; the distinctions lie in the second. In *Moran*, which the parties agree was a product liability case based on a duty to warn, the Court noted that "a manufacturer's duty to produce a safe product, with appropriate warnings and instructions when necessary, is no different from the responsibility each of us bears to exercise due care to avoid unreasonable risks of harm to others." *Moran*, 273 Md. at 543, 332 A.2d at 15.

In *Dehn* and *Doe*, which were not product liability cases, we made clear that, in an action sounding in negligence, the plaintiff must allege and prove (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty. *See also 100 Investment v. Columbia Town Ctr. Title*, 430 Md. 197, 212–13, 60 A.3d 1, 10 (2013). In *Gourdine*, we stated that the same requirements were applicable to a negligence count in a product liability action, citing, among other cases, *Doe* and *Dehn*. *See Dehn, supra*, 384 Md. at 619, 865 A.2d at 611; *Doe, supra*, 388 Md. at 414, 879 A.2d at 1092; *Gourdine, supra*, 405 Md. at 738, 955 A.2d at 779.

We turn to the first, and, in this case most directly relevant, of those four elements—was Georgia Pacific under a duty to protect Ms. Farrar from injury by reason of any exposure she may have to asbestos fibers that were embedded in its Ready-

Mix compound? In determining whether a duty exists under common law, we have accepted the definition of "duty" crafted by Deans William Prosser and W. Page Keeton, as "an obligation to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *See 100 Investment, supra,* 430 Md. at 213, 60 A.3d at 10, citing *Prosser and Keeton on The Law of Torts,* § 53 (5th ed. 1984); also *Gourdine,* 405 Md. at 745, 955 A.2d at 783 and *Barclay v. Briscoe, supra,* 427 Md. at 293, 47 A.3d at 574.

We concluded in *Gourdine* that "[a]t its core, the determination of whether a duty exists represents a policy question of whether the specific plaintiff is entitled to protection from the defendant" and, quoting from *Rosenblatt v. Exxon,* 335 Md. 58, 77, 642 A.2d 180, 189 (1994) that "ultimately, the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interests are, or are not, entitled to legal protection against the conduct of the defendant." *Id.* In *Doe,* we observed that "[t]here is no set formula for the determination of whether a duty exists," that "[w]e have applied a 'foreseeability of harm' test, 'which is based upon the recognition that duty must be limited to avoid liability for unreasonably remote circumstances,' and that '[w]e have also looked at the relationship of the parties.'" *Doe,* 388 Md. at 415, 879 A.2d at 1092–93. Quoting from *Patton v. USA Rugby,* 381 Md. 627, 637, 851 A.2d 566, 571 (2004), we recounted the following non-exclusive list of factors for balancing the policy considerations inherent in the determination of whether a duty exists:

> "The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved."

In *100 Investment, supra,* 430 Md. at 213–14, 60 A.3d at 10–11, we confirmed as guideposts in that weighing process "the nature of the harm likely to result from a failure to exercise due care" and "the relationship between the parties." In *Gourdine*—again in a general common law context—we confirmed the point also made in *Patton, supra,* that, where the failure to exercise due care creates risks of personal injury, the principal determinant of duty becomes foreseeability, which "is simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm." The Court made clear, however, again citing earlier cases, that "the fact that a result may be foreseeable does not itself impose a duty in negligence terms" and that "[w]hile foreseeability is often considered among the most important of [the] factors, its existence alone does not suffice to establish a duty under Maryland law." *Gourdine,* 405 Md. at 745–46, 955 A.2d at 783–84.

These consistent pronouncements were all in the general context of determining when a tort duty exists, in particular a duty to warn. They neither focused on nor excluded any particular tort, including product liability. What they tell us is that, whether a person has a legal duty to warn other individuals who may suffer harm by reason of the person's conduct, or lack thereof, depends on a number of factors that need to be balanced, that the foreseeability of harm to those individuals, at least in some instances, may be the most important of those factors, but that foreseeability of harm it is not the only factor to be considered.

We are long past any debate that asbestos is a dangerous product—that exposure to it may cause not only mesothelioma but also a variety of other diseases of the lungs—and that, absent some particular exception in the law, there is a duty on the part of the manufacturer of asbestos-laden products to warn of the danger. *See Eagle–Picher v. Balbos, supra,* 326 Md. 179, 604 A.2d 445. The more focused issue is, to whom does that duty extend? The general standard on that issue, clearly applicable to product liability cases and, in particular, to exposure to asbestos, is stated in § 388 of the Restatement

(Second) of Torts—that the duty extends "to those whom the supplier should expect to use the chattel" with the consent of the person to whom it is supplied "or to be endangered by its probable use." [1]   Comment *d.* to § 388 emphasizes that the supplier is subject to liability "not only to those for whose use the chattel is supplied but also to third persons whom the supplier *should expect to be endangered by its use.*"   (Emphasis added)

The plaintiff highlights that provision as the answer to the question.   It was foreseeable, she contends, that individuals working with or in the vicinity of the Ready–Mix product would get asbestos-laden dust on themselves and their clothing, that they would bring that dust home with them, and that other household members, especially those who directly came into contact with the clothing, would be exposed to the asbestos, that those household members were therefore in danger of contracting asbestos-related diseases, and that they were entitled to be warned of the danger.   Georgia–Pacific accepts that the duty to warn extends not just to those who actually handle the product but also to workers in close proximity to the use of the product—immediate bystanders.   *See Eagle–Picher v. Balbos, supra,* 326 Md. at 196, 604 A.2d at 453.   The company insists, however, that, as a matter of law, that is where the duty ends.

Neither view is entirely correct.   What we find from a survey of our case law and that in other States is that whether a duty to warn extends to individuals such as Ms. Farrar depends, in large part, on (1) who is being sued and on what theory, and (2) when a manufacturer or supplier of an asbestos product is sued for failure to warn the household member, (i) when the exposures occurred—in effect, what the defendant

---

1.   This Court has not adopted the standard set forth in § 2 of the Restatement (Third) of Torts, pronouncing that a product is defective because of inadequate warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable warnings, although, in the context of the issue now before us, there may be little difference between that and § 388 of the Restatement (Second).

knew or reasonably should have known about the dangers of household exposure at the time the warning should have been given, and (ii) the relative weight to be given to foreseeability, as opposed to other factors, such as the relationship between the parties and the feasibility or burden of providing warnings, under the State's negligence and product liability law.

With respect to who is being sued and on what theory, plaintiffs seeking recovery for injuries due to asbestos brought into the home on the clothing of other household members have advanced theories of recovery other than traditional product liability, and that needs to be taken into account in assessing the relevance of those decisions. Some household-member plaintiffs have sued the worker's employer, claiming an extended duty to household members to provide a safe workplace. Several courts, including the Court of Special Appeals, have concluded that *that* duty extends only to employees and others who were exposed while present in the workplace and not to individuals in the employees' household whose exposure did not occur in the workplace. *See,* in addition to *Adams v. Owens–Illinois, supra,* 119 Md.App. 395, 705 A.2d 58; *In the Matter of New York City Asbestos Litigation,* 5 N.Y.3d 486, 806 N.Y.S.2d 146, 840 N.E.2d 115 (2005); and *CSX Transportation, Inc. v. Williams,* 278 Ga. 888, 608 S.E.2d 208 (2005).

Although that view is consistent with our holding in *Doe,* it is not a unanimous view. *See Chaisson v. Avondale Industries, Inc.,* 947 So.2d 171 (La.App.2006); and *Simpkins v. CSX Transportation,* 358 Ill.Dec. 613, 965 N.E.2d 1092 (2012). Some household-member plaintiffs have sued the worker's employer for failure to comply with OSHA safety regulations regarding asbestos (*see infra* ). So far, they, too, have been unsuccessful. *See Riedel v. ICI Americas, Inc.,* 968 A.2d 17 (Del.2009) and *Price v. E.I. DuPont de Nemours,* 26 A.3d 162 (Del.2011).

Other actions by household members have been against the owner of the facility where the occupational exposure occurred based on an extended stretch of premises liability. Those

actions have largely been unsuccessful as well. *See In re Certified Question From the Fourteenth District Court of Appeals of Texas,* 479 Mich. 498, 740 N.W.2d 206 (2007); *Boley v. Goodyear Tire & Rubber Co.,* 125 Ohio St.3d 510, 929 N.E.2d 448 (2010); *Campbell v. Ford Motor Co.,* 206 Cal. App.4th 15, 141 Cal.Rptr.3d 390 (2012); and *In re Eighth Judicial District Asbestos Litigation,* 12 Misc.3d 936, 815 N.Y.S.2d 815 (2006); but *compare Olivo v. Owens–Illinois, Inc.,* 186 N.J. 394, 895 A.2d 1143 (2006), reaching an opposite result.

Where the action is not based on the duty to provide a safe workplace or premises liability but is against the manufacturer or supplier of the asbestos-laden product based on a duty to warn, the cases have turned more directly on the foreseeability of harm to the person to whom the duty is alleged to owe— whether the defendant should have recognized that household members were in a significant zone of danger because of toxic dust brought home on the worker's clothing and body. Ethel Granski—one of the four plaintiffs in *Anchor Packing v. Grimshaw,* 115 Md.App. 134, 692 A.2d 5 (1997) (*Grimshaw* ), *vacated on other grounds sub nom. Porter Hayden Co. v. Bullinger,* 350 Md. 452, 713 A.2d 962 (1998)—allegedly contracted mesothelioma from exposure to asbestos dust brought into the home by her stepfather, who collected that dust on his clothing while at work. Like Ms. Farrar, Ms. Granski, during the period 1953 to 1963, was responsible for washing the clothing. Like Ms. Farrar, she sued the manufacturer of the asbestos present at the worksite. Rejecting the manufacturer's argument that Ms. Granski's injury was not foreseeable, the Court of Special Appeals held:

"In the case before us, the evidence supported the conclusion that OC [the manufacturer of the asbestos-laden product] could reasonably expect that workers would bring home work clothes covered in asbestos dust and thereby expose their families to harm. This is so because OC knew or should have known that its asbestos-containing insulation product, Kaylo, was a hazardous product. Thus, OC could reasonably foresee that the use of its product, which results

in asbestos dust becoming airborne and soiling insulators' clothes, may result in workers wearing their asbestos-covered clothes home and exposing their households to harms associated with asbestos dust. It is not necessary that OC foresee the exact manner in which harm could occur, e.g., that a Kaylo insulator's family member might be exposed to hazardous asbestos fibers when washing the worker's clothing." *Grimshaw,* 115 Md.App. at 193, 692 A.2d at 34–35.

In reaching that conclusion, the court relied on two strains of evidence—one, that OC should have known generally of the hazards of airborne asbestos fibers released from its product, and the other, testimony from an expert that "known in the industry since 1930 is the fact that it is important for workers not to bring toxic substances home on their clothing and thereby expose their families to it." *Id.* at 194, 692 A.2d 5, 692 A.2d at 35. *See also ACandS v. Abate,* 121 Md.App. 590, 680–81, 710 A.2d 944, 988–89 (1998) where, alluding only to the fact that "there was medical testimony that household exposure to asbestos dust can cause disease" and without describing the nature of that evidence, the court reached a similar result with respect to the plaintiff Frederick Glensky.

In hindsight, there is a gap in that analysis—one to which courts are now paying greater attention. It may be true that the danger from bringing "toxic substances" generally into the home was recognized as early as 1930. What the evidence before us shows, however, was that the connection between lung disease and exposure to asbestos dust brought into the home on the clothing of workers was not generally recognized until at least three decades later. The Court of Special Appeals dealt with the records and arguments before it in those cases. The conclusion reached, however—that a duty existed as far back as 1958 or 1962 to warn household members having no connection with the product or the workplace—does not square with the evidence before us.

The elements of "duty" that we have described, especially foreseeability of danger and the ability, through a warning, to ameliorate that danger, must be based on facts that were

known or should have been known to the defendant at the time the warning should have been given, not what was learned later. Restatement (Second) § 388(a) casts liability where the supplier "knows or has reason to know that the chattel is or is likely to be dangerous ..." Comment *b.* to that section emphasizes that liability is for the failure to exercise reasonable care to give to those whom he may expect to use the chattel "any information as to the character and condition of the chattel *which he possesses,* and which he should recognize as necessary to enable them to realize the danger of using it." (Emphasis added).

In *ACandS v. Asner*, 344 Md. 155, 165, 686 A.2d 250, 254 (1996), quoting from *Lohrmann v. Pittsburgh Corning, Corp.*, 782 F.2d 1156, 1164 (4th Cir.1986), we pointed out that "[s]tate of the art includes all available knowledge on a subject *at a given time* ..." (Emphasis added). The Colorado court confirmed in *Fibreboard Corp. v. Fenton*, 845 P.2d 1168, 1172 (Colo.1993) that, under § 402A of the Restatement (Second), "[a] manufacturer cannot warn of dangers that were not known to it or knowable in light of the *generally recognized and prevailing* scientific and technical knowledge available at the time of manufacture and distribution." (Emphasis added). As the *Fenton* court and other courts have pointed out, any other rule would make the manufacturer not just *strictly,* but *absolutely* liable—an insurer of the product's safety—and that is not the law.

Although the danger of exposure to asbestos in the workplace was well-recognized at least by the 1930s, the danger from exposure in the household to asbestos dust brought home by workers, though in hindsight perhaps fairly inferable, was not made publicly clear until much later.[2] This has been

---

2. In attempting to illustrate the impossibility of determining the universe of persons who may need to be warned if the plaintiff's argument is accepted, Georgia Pacific raises the prospect of whether, if the worker rides a bus home or stops at a bar or grocery store on the way home, the duty to warn would extend to the bus driver, other passengers on the bus, the bartender, other patrons in the bar, the cashier in the grocery store, or other customers. That is not what is before us.

commented upon in other cases and was the subject of testimony in this case.

The earliest reference to a concern about household exposure to asbestos mentioned in this case was in the testimony of Morton Corn, PhD., a former head of OSHA who testified as an expert for Georgia Pacific. Dr. Corn referenced a 1960 article by a Dr. Wagner regarding the association of mesothelioma and asbestos in South Africa. His unspecific reference, it appears, was to *Diffuse Pleural Mesothelioma and Asbestos Exposure in the North Western Cape Province,* by J.C. Wagner, C.A. Sleggs, and Paul Marchand, published in *Brit. J. of Industr. Med.* 1960, 17–260–71. The article reported 33 cases of mesothelioma in the asbestos mining area of Cape Province, South Africa. Of the 33, the authors concluded that 28 had "some association with the Cape asbestos field and four cases had been exposed to asbestos in industry." One had no reported exposure to asbestos. The article does not suggest that any of the 32 who had some exposure were exposed only from asbestos brought into the home on the clothing of an occupationally-exposed household member. Nonetheless, Dr. Corn observed that the article, along with one in 1955 by Dr. Richard Doll, a British epidemiologist, discussing the conjunction between fibrosis and lung cancer,[3] suggested a "pathway of exposure" into the home of asbestos workers but that "with the knowledge of the day and the specificity of this for crocidolite which we didn't use much of and they did not have an impact." When asked whether it would have been prudent for manufacturers of asbestos products to have become aware of those two studies, Dr. Corn observed that "[m]ost companies do not have the expertise to evaluate first reports in science."

The study that experts from both sides regarded as more significant was one by Muriel Newhouse and Hilda Thompson

---

We are dealing only with household members, who constitute an identifiable class of individuals.

3. *See* Richard Doll, *Mortality from Lung Cancer in Asbestos Workers,* Brit. J. Industr. Med., 1955, 12, 81.

in 1965. *See Mesothelioma of Pleura and Peritoneum Following Exposure to Asbestos in the London Area,* published in *Brit. J. Industr. Med.* 1965, 22,261. The study concerned 76 persons who lived in the vicinity of an asbestos factory in the London area and who contracted lung disease. Although most (67) of those persons had neither an occupational nor a household exposure to asbestos but, like the cases in South Africa, may have been exposed because they lived in the vicinity of the factory, nine of the subjects were exposed to dust brought home by a family member and later were diagnosed with mesothelioma or asbestosis.

Shortly before publication in the British journal, the Newhouse/Thompson findings were presented, along with other papers, to a Conference on Biological Effects of Asbestos held in New York in October 1964. The Conference was organized by Dr. Irving Selikoff, a leading researcher into the connection between exposure to asbestos and lung-related diseases, and was hosted by the New York Academy of Sciences. The papers presented at that Conference were published in the Annals of the New York Academy of Sciences, 1965, Vol. 32.

Though concerned about the Newhouse/Thompson findings, Dr. Selikoff, at a July 1971 meeting organized by the International Association of Heat and Front Insulators and Asbestos Workers, observed that research was being done in New York on the problem and that "so far, fortunately, the data looks reassuring" but that the studies were continuing. He advised that workers exposed to asbestos change their clothes before going home.[4]

The clear and most widely broadcast breakthrough came in June 1972, when OSHA adopted regulations dealing specifically with the problem of tracking asbestos dust on clothing into the home. In addition to setting a maximum level of airborne asbestos fibers to which workers could be exposed during an 8–hour period, the regulations require, among other things,

---

4. The proceedings of that meeting were printed in *The Asbestos Worker* (Vol. XVII No. 16, August 1971 at 9). *See* also testimony of John Maddox, one of Ms. Farrar's expert witnesses, Record Extract at 537.

that employers (1) provide and require the use of special protective clothing, including head covering, gloves, and foot coverings for employees exposed to airborne concentrations of asbestos fibers that exceed the maximum allowed level; (2) provide change rooms and lockers for employees, so they may change from their work clothes into street clothes; and (3) provide for the laundering of asbestos-contaminated clothing in a safe manner. *See 37 Federal Register No. 110,* June 7, 1972, at 11321. *See* also *Asbestos Standard for General Industry,* OSHA 3095 (1995). OSHA subsequently added requirements that employers ensure that employees remove asbestos-contaminated clothing only in the change rooms and that they not be permitted to take that clothing out of the change room. *See* OSHA Safety and Health Standard 1910.1001(h)(2).

As germane to what generally was known in the scientific community regarding the particular danger from household exposure to asbestos on work clothes, it has been noted that OSHA provided "minimal written justification for the 1972 final asbestos standard" and that "[n]ot a single study was specifically cited." *See* John Martonik, Edith Nash, Elizabeth Grossman, *The History of OSHA's Asbestos Rulemakings and Some Distinctive Approaches that They Introduced for Regulating Occupational Exposure to Toxic Substances,* American Industrial Hygiene Association Journal, 62:208, 212 (2001). OSHA commented on that in its preamble to the 1972 regulations:

"In view of the undisputed grave consequences from exposure to asbestos fibers, it is essential that the exposure be regulated now, on the basis of the best evidence available now, even though it may not be as good as scientifically desirable. An asbestos standard can be reevaluated in the light of the results of ongoing studies, and future studies, but cannot wait for them."

In *Satterfield v. Breeding Insulation Company,* 266 S.W.3d 347 (Tenn.2008), the court found liability against an employer which, after adoption of the 1972 regulations, permitted its employee to wear contaminated work clothes home. Indeed,

whether or not there was solid scientific evidence at the time to support the 1972 regulations, no manufacturer, supplier, or employer could ignore the fact that the Federal agency specifically created by Congress to assure and supervise safety in the workplace had concluded that exposure to asbestos dust on clothing was a significant health hazard and had adopted fairly extensive and intrusive regulations to deal with that hazard.

Conversely, some courts have been reluctant to find duty-to-warn liability where the household exposures occurred much before then, at least in the absence of evidence that the defendant was aware, or should have been aware, of the danger *to household members* at the time. *See Rohrbaugh v. Owens–Corning Fiberglas Corporation,* 965 F.2d 844 (10th Cir.1992) (applying Oklahoma law); *Martin v. Cincinnati Gas and Electric Co.,* 561 F.3d 439 (6th Cir.2009) (applying Kentucky law). Some courts have looked back to the 1964–65 study by Newhouse and Thompson. *See Estate of Holmes v. Pneumo Abex, L.L.C.,* 2011 IL App (4th) 100462, 353 Ill.Dec. 362, 955 N.E.2d 1173, 1178 (2011); *Rodarmel v. Pneumo Abex, L.L.C.,* 2011 IL App (4th) 100463, 354 Ill.Dec. 6, 957 N.E.2d 107, 126 (2011); *Alcoa, Inc. v. Behringer,* 235 S.W.3d 456, 461 (Tex.App.2007). One court referenced the earlier study from South Africa. *See Exxon Mobil Corp. v. Altimore,* 256 S.W.3d 415, 419 (Tex.App.2008).

Other courts, like the Court of Special Appeals in *Grimshaw* and *Abate,* without discussing in any detail the state of knowledge at the time regarding the danger from household exposure, have concluded, tacitly or otherwise, that it is at least a jury issue whether a manufacturer knew or should have known prior to the mid–1960s whether household members were within a foreseeable zone of danger. *See Stegemoller v. ACandS,* 767 N.E.2d 974 (Ind.2002) (exposure to asbestos-laden clothes from 1947 to 1988) and *Lunsford v. Saberhagen Holdings,* 125 Wash.App. 784, 106 P.3d 808 (2005) (exposure in 1958).

In *Satterfield, supra,* the Tennessee court observed that "courts across the country have disagreed as to how these broad principles of tort law should be used to determine whether an employer owes a duty to persons who develop asbestos-related illnesses after exposure to asbestos fibers on its employees' clothing," but that, although the courts have reached inconsistent conclusions, a pattern had begun to emerge. Courts that recognize a duty have focused on the foreseeability of harm resulting from the failure to warn or to take precautions to prevent the exposure, whereas courts finding no duty have focused on the lack of any relationship between the employer and the injured party. *Satterfield,* 266 S.W.3d at 361.

As noted, with respect to actions against the employer, this Court has focused on the latter and found no duty to spouses of employees. To some extent, the same tension exists in product liability actions against manufacturers and suppliers. We have made clear that the fact that an individual or class of individuals is foreseeably within a zone of danger, though important, is not the sole criterion in determining a duty to warn, even in a product liability case.

Determining the existence of a duty requires the weighing of policy considerations, among which are whether, in light of the relationship (or lack of relationship) between the party alleged to have the duty and the party to whom the duty is alleged to run, there is a feasible way of carrying out that duty and having some reason to believe that a warning will be effective. To impose a duty that either cannot feasibly be implemented or, even if implemented, would have no practical effect would be poor public policy indeed.

With respect to implementation, in an era before home computers and social media, it is not at all clear how the hundreds or thousands of manufacturers and suppliers of products containing asbestos could have directly warned household members who had no connection with the product, the manufacturer or supplier of the product, the worker's employer, or the owner of the premises where the asbestos

product was being used, not to have contact with dusty work clothes of household members who were occupationally exposed to asbestos. The best that the plaintiff offers in her brief was for Georgia Pacific to have "spread the word" to distributors of the product, the owners of land on which the product was used, contractors who supervised the workers, and union officials, and rely on them to inform everyone working in the vicinity of asbestos. Presumably, the word to be spread was that asbestos dust collected on work clothes could be dangerous if brought into the home.

Assuming such warnings would, in fact, have reached the workers, much less bystanders, until the 1972 OSHA regulations were adopted, unless employers or the owners of premises where asbestos dust would be present voluntarily provided protective clothing, changing rooms, and safe laundering— which the record before us does not suggest was done by any of Mr. Hentgen's employers or existed at any facility where Mr. Hentgen worked—what were the workers to do? Mr. Hentgen did the best he could by keeping his work clothes in the car all week and bringing them home only on the weekend to be laundered, but that proved insufficient. The simple fact is that, even if Georgia Pacific should have foreseen back in 1968–69 that individuals such as Ms. Farrar were in a zone of danger, there was no practical way that any warning given by it to any of the suggested intermediaries would or could have avoided that danger.

On the record before us, we conclude that the Court of Special Appeals erred in finding a duty on the part of Georgia Pacific to warn Ms. Farrar, back in 1968–69, of the danger of exposure to the dust on her grandfather's clothes. Its judgment, and the judgment of the Circuit Court, must be reversed. As noted, in light of that ruling, it is not necessary to consider the alternative argument that the evidence was insufficient to support a finding that exposure to the dust from the Ready–Mix product was a substantial contributing factor in causing Ms. Farrar's mesothelioma.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.

BELL, C.J., joins judgment only.