*Estate of Concetta Schatz, et al. v. John Crane, Inc.*, No. 1300, September 2017 Term. Opinion by Beachley, J.

**DUTY OF CARE—DUTY TO WARN THIRD PARTIES—FORESEEABILITY OF HARM—FEASIBILITY OF WARNING—FEASIBILITY OF WARNING INTERMEDIARIES—EFFECTIVENESS OF WARNING**

Husband of decedent worked in a facility and routinely handled John Crane, Inc. ("JCI") brand packing rope, which contained asbestos. In working with JCI rope, husband was exposed to asbestos dust. After work, husband would come home and his wife, decedent, would wash his asbestos-covered work clothing. Doing so exposed decedent to asbestos dust. Decedent contracted mesothelioma and eventually passed away.

Decedent, through her estate and surviving daughters ("appellants"), brought a products liability claim against John Crane, Inc. ("JCI"). The case proceeded to trial, and at the close of decedent's case-in-chief, JCI moved for judgment, arguing that it did not owe a duty of care—the duty to warn—decedent. The trial court agreed with JCI and granted the motion. Decedent's estate and surviving daughters appealed.

*Held*: Judgment affirmed. Whether a duty to warn exists represents a policy consideration. There is no set formula for determining the existence of a duty. Maryland courts consider the "foreseeability of harm" and consider what the defendant knew or reasonably should have known at the time of exposure to harm. The "foreseeability" factor, however, is not dispositive. Maryland courts generally consider the relative weight to be given to "foreseeability" as opposed to other factors, including: the relationship between the parties, the feasibility of a warning, and the effectiveness of a warning.

Although there may have been evidence tending to show that JCI reasonably should have known of the harm at the time of decedent's exposure, the other factors weighed against establishing a duty to warn. Based on the facts presented in this case, it would not have been feasible for JCI to directly warn decedent. JCI had no relationship with decedent. Additionally, a duty does not exist simply because JCI could have warned an intermediary (decedent's husband) who supposedly would have warned decedent. Finally, appellants failed to present evidence at trial showing how a warning would have been effective—even if it would have been permissible for JCI to warn decedent's husband.

Circuit Court for Baltimore City
Case Nos. 24X1500318 & 24X1600024

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1300

September Term, 2017

ESTATE OF CONCETTA SCHATZ, et al.

v.

JOHN CRANE, INC.

Wright,
Beachley,
Zarnoch, Robert A.
    (Senior Judge, Specially Assigned),

JJ.

Opinion by Beachley, J.

Filed:  November 2, 2018

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document " authentic.



Suzanne C. Johnson, Acting Clerk

In 2015, Concetta Schatz ("Mrs. Schatz") passed away from malignant mesothelioma. After her death, Mrs. Schatz's estate and her four surviving daughters ("appellants") commenced a products liability action against John Crane, Inc. ("JCI" or "appellee"). Appellants alleged that Mrs. Schatz's husband, William Schatz ("Mr. Schatz"), would handle JCI products containing asbestos while at work, and then bring his asbestos-covered clothing home for Mrs. Schatz to clean, thus exposing her to asbestos fibers.

The case proceeded to trial. At the close of appellants' case-in-chief, JCI moved for judgment, arguing that appellants had failed to prove that JCI owed a legal duty to warn Mrs. Schatz pursuant to *Georgia-Pacific, LLC v. Farrar*, 432 Md. 523 (2013). Following arguments, the trial court granted JCI's motion. Appellants timely appealed and present two questions for our review, which we have condensed as follows[1]:

1. Whether the circuit court erred in granting JCI's motion for judgment.

We hold that the court did not err, and affirm.

---

[1] Appellants presented the following two questions for our review:

1. Whether the Circuit Court erred in finding that household members constitute an indeterminate class, contrary to the holding in *Farrar*.

2. Whether under *Farrar* a duty to warn extended to household members beginning in 1972 when OSHA promulgated safety regulations specifically addressing the problem of tracking asbestos dust on clothing into the home.

**FACTS AND PROCEEDINGS**

Mr. Schatz married Mrs. Schatz on November 13, 1955. Near the time of their marriage, Mr. Schatz began working for Baltimore Gas & Electric ("BG&E"), where he continued to work until he retired in the mid-to-late 1980s. For approximately the first two years of his employment with BG&E, Mr. Schatz worked with turbines. He was then transferred to Wagner Station and shortly thereafter was promoted to mechanic. Mr. Schatz remained a mechanic at Wagner Station for the rest of his career with BG&E. While working at Wagner Station as a mechanic, Mr. Schatz was responsible for repairing and maintaining a variety of equipment, including air compressors, coal machinery, fly ash hoppers, and of particular relevance here, boilers.

The boilers at Wagner Station each contained approximately 200 doors. The packing or sealing surrounding these doors would routinely deteriorate due to heat and dirt from the boilers, and Mr. Schatz and other mechanics were tasked with replacing the damaged packing with JCI rope.[2] The rope used was white and flexible, and when mechanics would cut it to fit into the doors, it created dust and dirt. Unfortunately, from 1930 until 1985, JCI's rope contained sixty percent chrysotile asbestos.

BG&E did not provide any laundry services to its employees when Mr. Schatz worked at Wagner Station as a mechanic, so he would typically take his dirty work clothes home for his wife to wash. Approximately every other day, Mrs. Schatz would shake out

---

[2] According to evidence introduced at trial, BG&E workers also used Phelps brand rope to replace the damaged packing around the doors of the boilers at Wagner Station.

2

and wash the dirty work clothes, breathing in the dust as she did so. After Mrs. Schatz passed away due to mesothelioma, appellants filed this products liability claim against JCI.

Appellants' trial against JCI began on July 25, 2017. JCI moved for judgment on August 4, at the close of appellants' case-in-chief. On August 8, the circuit court held that JCI did not owe a duty to warn Mrs. Schatz, and granted JCI's motion. Appellants timely appealed. We shall provide additional facts as necessary for our analysis.

## STANDARD OF REVIEW

"We review the trial court's grant of [JCI's] motion for judgment *de novo*, considering the evidence and reasonable inferences drawn from the evidence in the light most favorable to the non-moving party." *Thomas v. Panco Mgmt. of Md., LLC*, 423 Md. 387, 393-94 (2011) (citing *C & M Builders, LLC v. Strub*, 420 Md. 268, 290 (2011)).

## DISCUSSION

Appellants argue that the circuit court erred in concluding that JCI did not owe a duty to warn Mrs. Schatz. Specifically, they claim that: 1) the court erred "in finding that household members constitute an indeterminate class, contrary to the holding in *Farrar*"; and 2) "[U]nder *Farrar*, a duty to warn extended to household members beginning in 1972 when OSHA[3] promulgated safety regulations dealing specifically with the problem of tracking asbestos dust on clothing into the home." We first explain why JCI did not have a duty to warn Mrs. Schatz of the danger of exposure to its asbestos ropes. Though not

---

[3] Occupational Safety and Health Administration.

3

material to our holding, we then briefly address the court's finding that Mrs. Schatz did not belong to a "definite determinative class" under *Farrar*.

I.    JCI DID NOT OWE A DUTY TO MRS. SCHATZ

The parties to this appeal dispute whether JCI owed a duty to warn Mrs. Schatz of the dangers of its asbestos product. In *Farrar*, a case directly on point, the Court of Appeals discussed whether a manufacturer and supplier of an asbestos product had a duty to warn the family member of a bystander who was exposed to its product. 432 Md. at 526. There, John Hentgen ("Mr. Hentgen"), a mechanic in the construction industry, worked on a project at the Forrestal Building in Washington D.C. for a six or seven-month period from 1968 to 1969. *Id*. at 525. While there, Mr. Hentgen worked in the immediate vicinity of workers who would install drywall and then apply a "Georgia Pacific Ready-Mix joint compound to smooth the joints between the drywall slabs." *Id*. at 525-26. During the time that Mr. Hentgen worked at the Forrestal Building, Georgia Pacific's "Ready-Mix contained asbestos, and the sanding created a great deal of dust that got on Mr. Hentgen's clothes, hair, and skin." *Id*. at 526.

At the end of each work week, Mr. Hentgen would bring his work clothes home to be washed. *Id*. at 525. Jocelyn Farrar ("Ms. Farrar"), the plaintiff in that case, was Mr. Hentgen's granddaughter. *Id*. "During her teenage years in the 1960s, Ms. Farrar and her sister shared the task of shaking out Mr. Hentgen's work clothes, which were covered with asbestos-laden dust, laundering them, and sweeping the dust from the floor." *Id*. Unfortunately, Ms. Farrar was diagnosed with mesothelioma in 2008. *Id*.

4

Ms. Farrar filed claims against more than thirty defendants, including Georgia

Pacific, alleging, *inter alia*, strict liability and negligence claims. *Id*. at 526. After the jury

ruled in Ms. Farrar's favor, Georgia Pacific appealed, arguing that the trial court had erred

in denying its motion for judgment because it had no duty to warn Ms. Farrar. *Id*. After

this Court affirmed the circuit court's judgment, the Court of Appeals reversed, agreeing

with Georgia Pacific that it did not have a duty to warn persons such as Ms. Farrar. *Id*.

In discussing whether Georgia Pacific had a duty to warn, the Court of Appeals

explained that "[a]t its core, the determination of whether a duty exists represents a policy

question of whether the specific plaintiff is entitled to protection from the defendant." *Id*.

at 529 (quoting *Gourdine v. Crews*, 405 Md. 722, 745 (2008)). The Court recognized that

"[t]here is no set formula for the determination of whether a duty exists," but stated that it

"applied a 'foreseeability of harm' test, 'which is based upon the recognition that duty must

be limited to avoid liability for unreasonably remote circumstances[.]'" *Id*. at 529 (quoting

*Doe v. Pharmacia & Upjohn Co.*, 388 Md. 407, 415 (2005)). The Court cautioned,

however, that "[w]hile foreseeability is often considered among the most important of [the]

factors, its existence alone does not suffice to establish a duty under Maryland law." *Id*. at

530 (quoting *Gourdine*, 405 Md. at 745-46).

After establishing the overarching policy considerations, the Court narrowed its

focus for determining the existence of a duty:

> What we find from a survey of our case law and that in other States is that
> whether a duty to warn extends to individuals such as Ms. Farrar depends, in
> large part, on (1) who is being sued and on what theory, and (2) when a
> manufacturer or supplier of an asbestos product is sued for failure to warn
> the household member, (i) when the exposures occurred—in effect, what the

> defendant knew or reasonably should have known about the dangers of household exposure at the time the warning should have been given, and (ii) *the relative weight to be given to foreseeability, as opposed to other factors, such as the relationship between the parties and the feasibility or burden of providing warnings*, under the State's negligence and product liability law.

*Id*. at 531-32 (emphasis added). Put simply, the Court stated that in a household member's product liability action against a manufacturer for failure to warn, the existence of a duty is determined by two factors. The first factor is what the manufacturer knew or reasonably should have known about the dangers posed to household members when the exposures occurred—the "foreseeability of harm." *Id*. The second factor involves weighing the foreseeability of harm against other policy-based factors, including the relationship between the parties and the feasibility of providing warnings. *Id*.

Because Ms. Farrar, a household member, had sued Georgia Pacific, a manufacturer, for failure to warn, the Court first considered what Georgia Pacific knew or should have known about the dangers to household members at the time the exposure occurred. Although the evidence at trial showed that a 1960 article from South Africa recognized the concern for household member exposure to asbestos, experts for both parties regarded a 1965 study from England as more significant. *Id*. at 536-37. The Court noted, however, that "The clear and most widely broadcast breakthrough came in June 1972, when OSHA adopted regulations dealing specifically with the problem of tracking asbestos dust on clothing into the home." *Id*. at 537. The Court did not appear to resolve when Georgia Pacific was charged with knowledge of the danger its asbestos product posed to household members, and simply concluded that discussion by stating, "We have made clear that the fact that an individual or class of individuals is foreseeably within a zone of

6

danger, though important, is not the sole criterion in determining a duty to warn, even in a product liability case." *Id*. at 540.

Though recognizing the relevance of the manufacturer's knowledge of harm at the time of the exposure, the Court weighed competing policy considerations to determine whether a duty existed. The Court stated,

> Determining the existence of a duty requires the weighing of policy considerations, among which are whether, in light of the relationship (or lack of relationship) between the party alleged to have the duty and the party to whom the duty is alleged to run, there is a feasible way of carrying out that duty and having some reason to believe that a warning will be effective. To impose a duty that either cannot feasibly be implemented or, even if implemented, would have no practical effect would be poor public policy indeed.

*Id*. at 540. In other words, the Court considered the feasibility of warning the household member, and how effective that warning would be. *Id*. Regarding the feasibility of Georgia Pacific warning Ms. Farrar, the Court expressed doubt that, in the era before home computers and social media,

> manufacturers and suppliers of products containing asbestos could have directly warned household members who had no connection with the product, the manufacturer or supplier of the product, the worker's employer, or the owner of the premises where the asbestos product was being used, not to have contact with dusty work clothes of household members who were occupationally exposed to asbestos.

*Id*. at 540-41. Due to the lack of any relationship between Georgia Pacific and Ms. Farrar, the Court held that there was no feasible way to warn.

After discussing the feasibility of the warning, the Court considered how effective the manufacturer's warning to workers and bystanders would have been. The Court stated,

7

Assuming such warnings would, in fact, have reached the workers, much less bystanders, until the 1972 OSHA regulations were adopted, unless employers or the owners of premises where asbestos dust would be present voluntarily provided protective clothing, changing rooms, and safe laundering—which the record before us does not suggest was done by any of Mr. Hentgen's employers or existed at any facility where Mr. Hentgen worked—what were the workers to do? Mr. Hentgen did the best he could by keeping his work clothes in the car all week and bringing them home only on the weekend to be laundered, but that proved insufficient. The simple fact is that, even if Georgia Pacific should have foreseen back in 1968-69 that individuals such as Ms. Farrar were in a zone of danger, there was no practical way that any warning given by it to any of the suggested intermediaries would or could have avoided that danger.

*Id*. at 541. Because the evidence did not show what effective measures Mr. Hentgen could have taken to shield individuals such as Ms. Farrar from the zone of danger, the Court concluded that a warning would not have prevented harm to individuals such as Ms. Farrar. *Id*. Because the Court held that it was not feasible for Georgia Pacific to warn Ms. Farrar, and that a warning (even if feasible) would not have effectively prevented harm, the Court found that Georgia Pacific did not owe a duty in 1968-69 to warn Ms. Farrar of the danger of asbestos dust on her grandfather's clothes. *Id*.

Naturally, appellants attempt to distinguish their case from *Farrar*. They first contend that, by 1972, household members were within a foreseeable zone of danger. They go on to argue that "JCI owed a duty to warn even if it was not feasible to directly warn household members." Finally, appellants claim that a warning to the workers would have been effective because of OSHA's 1972 regulations. We shall address each contention in turn.

8

A. The Foreseeable Zone of Danger in June 1972

Appellants first claim that a duty to warn extended to household members starting in 1972 because OSHA had promulgated safety regulations for tracking asbestos dust into the home. Borrowing language from *Farrar*, appellants essentially argue that JCI "knew or reasonably should have known about the dangers of household exposure at the time the warning should have been given[.]" *Id*. at 531. To support this argument, appellants note that *Farrar* stated that "The clear and most widely broadcast breakthrough came in June 1972, when OSHA adopted regulations dealing specifically with the problem of tracking asbestos dust on clothing into the home." *Id*. at 537. Inferentially, appellants argue that this language means that, as a matter of law, manufacturers and suppliers of asbestos knew about the dangers of household exposure, at the latest, by June 1972.

Whether *Farrar* stands for that broad proposition is substantially immaterial to our analysis. In *Farrar*, the Court noted that the evidence varied on the actual date upon which Georgia Pacific knew or should have known of the dangers. An expert for Georgia Pacific referenced an article from 1960 recognizing the potential harm to household members, but the Court stated that "The study that experts from both sides regarded as more significant was . . . in 1965." *Id*. at 536-37. Despite evidence from Georgia Pacific that it may have or reasonably should have known of the dangers of asbestos to household members at the time of exposure, the Court ultimately gave less weight to the foreseeability of harm, and more weight to the other policy factors. The Court stated, "We have made clear that the fact that an individual or class of individuals is foreseeably within a zone of danger, though important, is not the sole criterion in determining a duty to warn, even in a product liability

9

case." *Id*. at 540. Like the Court in *Farrar*, we shall give greater weight to the policy considerations.

B. Feasibility of Warning Mrs. Schatz

Appellants next argue that JCI "owed a duty to warn even if it was not feasible to directly warn household members." According to appellants, "*Farrar* does not require it to be feasible for [JCI] to have warned the household member *directly*. To the contrary, *Farrar* makes clear that [JCI] could have warned 'intermediaries.'" In support of this argument, appellants claim "*Farrar* listed various intermediaries, suggested by the plaintiff, who could have been warned: 'distributors of the product, the owners of land on which the product was used, contractors who supervised the workers, and union officials.'" Appellants misconstrue the "feasibility" discussion in *Farrar*.

First, the Court never stated that the feasibility of the warning depended on the ability of the manufacturer to warn an intermediary. Instead, the Court focused on the ability of the manufacturer to warn the *household member*. Discussing feasibility, the Court stated,

> With respect to implementation, in an era before home computers and social media, *it is not at all clear how hundreds or thousands of manufacturers and suppliers of products containing asbestos could have directly warned household members who had no connection with the product, the manufacturer or supplier of the product, the worker's employer, or the owner of the premises where the asbestos product was being used*, not to have contact with dusty work clothes of household members who were occupationally exposed to asbestos.

*Id*. at 540-41 (emphasis added). It is clear from the Court's discussion that the feasibility of the warning applied to the household member as opposed to an intermediary.

10

Next, we disagree with appellants that *Farrar* provided a list of approved intermediaries in its feasibility discussion. The passage in *Farrar* from which appellants find support for warning intermediaries reads as follows:

> *The best that the plaintiff offers in her brief* was for Georgia Pacific to have "spread the word" to distributors of the product, the owners of land on which the product was used, contractors who supervised the workers, and union officials, and rely on them to inform everyone working in the vicinity of asbestos. Presumably, the word to be spread was that asbestos dust collected on work clothes could be dangerous if brought into the home.

*Id*. at 541 (emphasis added). Nowhere in the opinion did the Court of Appeals approve of the list of intermediaries appellants rely on to bolster their argument here. Instead, the Court was reciting the contents of the plaintiff's appellate brief. In fact, the only reference to "intermediaries" in the entire opinion appears in the Court's "effectiveness" discussion, where the Court stated,

> The simple fact is that, even if Georgia Pacific should have foreseen back in 1968-69 that individuals such as Ms. Farrar were in a zone of danger, there was no practical way that any warning given by it to any of the suggested intermediaries would or could have avoided that danger.

*Id*. We do not construe this statement as establishing the duty to warn an intermediary. In fact, the Court of Appeals has rejected the notion that a duty to warn extends to a plaintiff simply because of the plaintiff's relationship to an intermediary.

In *Dehn v. Edgecombe*, the Court of Appeals held that a doctor's duty to warn did not extend to his patient's spouse simply because of the relationship between the patient and the spouse. 384 Md. 606, 610 (2005). There, Mr. and Mrs. Dehn sued Mr. Dehn's family doctor, Dr. Edgecombe, for negligence related to an unsuccessful vasectomy. *Id*. After the trial court found that Dr. Edgecombe did not owe Mrs. Dehn a duty and dismissed

11

her negligence claims, Mrs. Dehn appealed. *Id*. at 615. The Court of Appeals upheld the dismissal, stating that it was not "willing to impose a legal duty on Dr. Edgecombe with regard to Mrs. Dehn based simply on his alleged awareness that Mr. Dehn was married." *Id*. at 626. Rather than rely on Mrs. Dehn's relationship to an intermediary—her husband—the Court instead required a special relationship between the plaintiff, Mrs. Dehn, and the defendant, Dr. Edgecombe. The Court stated, "A duty of care does not accrue purely by virtue of the marital status of the patient alone; some greater relational nexus between doctor and patient's spouse must be established[.]" *Id*. The Court rejected the notion that the duty to warn extended to the plaintiff by virtue of the plaintiff's relationship to an intermediary. Instead, an actual relationship between the plaintiff and defendant was necessary to impose a legal duty.

Although *Dehn* involved a doctor-patient relationship, the Court of Appeals applied the same reasoning to a case between an employer and an employee's spouse in *Doe v. Pharmacia & Upjohn Co., Inc*., 388 Md. 407 (2005). There, the Court of Appeals addressed "whether Pharmacia had a legal duty to protect Ms. Doe from injury or harm by exercising reasonable care in testing Mr. Doe and by warning *him* of the possibility that he had contracted HIV-2." *Id*. at 414 (emphasis added). Ms. Doe claimed that Pharmacia owed *her* a duty because it was responsible for informing *Mr. Doe* of his test results and protecting his health. *Id*. at 420. The Court of Appeals rejected this argument, stating, "In this context, an employer could owe a duty to a third party [Ms. Doe] only in extraordinary circumstances. Such extraordinary circumstances do not exist in this case. Ms. Doe had no relationship with Pharmacia." *Id*. Rather than find that the duty to warn extended by

12

way of an intermediary, the Court instead required a relationship between the plaintiff and defendant. *Cf. Adams v. Owens-Illinois*, 119 Md. App. 395, 411 (1998) (holding that duty owed to employee was not relevant in establishing duty to employee's spouse).

In both *Dehn* and *Doe*, the Court of Appeals considered whether the duty to warn extended to a spouse whose husband had a direct relationship with the defendant. In both cases, the Court rejected the notion that the duty extended to the spouse simply because the defendant was obligated to warn the intermediary spouse. Accordingly, Maryland courts have not accepted appellant's "intermediary argument," and we decline to do so here.

Even assuming, *arguendo*, that Maryland permitted warning intermediaries to establish a duty, we note that the record here is devoid of any evidence to support their "intermediary" theory. Indeed, nowhere in the portion of Mr. Schatz's deposition which was introduced at trial did he explain what he would have done to warn Mrs. Schatz had he himself been warned of the dangers of asbestos. Accordingly, we reject appellants' argument that a duty extended to Mrs. Schatz because of the feasibility of warning Mr. Schatz. [4]

---

[4] In a footnote in their brief, appellants attempt to overcome the lack of evidence on this issue by contending that, "it must be presumed that, had *he* been warned, Mr. Schatz would have sought recourse from [BG&E] and, if necessary, from [Maryland Occupational Safety and Health]." (Emphasis added). Appellant's "heeding presumption" argument relies on the assumption that JCI was required to warn Mr. Schatz—an intermediary—who would presumably take steps to protect Mrs. Schatz—the injured person. As we have explained above, the duty to warn does not extend simply because the defendant has the ability or obligation to warn an intermediary. *Doe*, 388 Md. at 420; *Dehn*, 384 Md. at 626. Accordingly, it does not matter if Mr. Schatz would have presumptively heeded a

13

C. The Effect of Warning Workers in 1972

Finally, appellants argue that it would have been effective to warn workers such as Mr. Schatz because they could have forced compliance with OSHA's 1972 regulations. According to appellants, "had [JCI] warned Mr. Schatz, he had recourse via a complaint to MOSH[5] to compel the provision of safe laundering." We see two problems with this argument.

First, because Mrs. Schatz was the injured party, the analysis should focus on JCI's duty to warn *Mrs. Schatz*, not Mr. Schatz. In claiming that it was practical to warn Mr. Schatz in 1972 because the workers had recourse, appellants change the party to whom JCI allegedly owed its duty to warn. As stated above, the relationship (or lack thereof) of the parties is a relevant factor in determining the existence of a duty to warn. *Farrar,* 432 Md. at 529. As in *Farrar*, there is no apparent relationship between JCI, the manufacturer, and Mrs. Schatz, the household member.

Second, assuming it would have been legally sufficient for JCI to warn Mr. Schatz, the evidence adduced at trial failed to demonstrate what Mr. Schatz would or could have done to limit asbestos exposure to Mrs. Schatz.[6] Even if *Farrar* expressly permitted the

---

hypothetical warning when determining JCI's duty to Mrs. Schatz. JCI had no relationship with Mrs. Schatz.

[5] Maryland Occupational Safety and Health.

[6] At oral argument, appellants noted that BG&E provided showers and changing rooms which Mr. Schatz used. The existence of these facilities, however, does not impact the fact that Mrs. Schatz was allegedly exposed to asbestos when washing Mr. Schatz's work clothes.

warning to flow through an intermediary (which it does not), we reject appellants'

argument that Mr. Schatz's alleged recourse via a complaint to MOSH proved that a

warning would have been effective. In *Farrar*, the Court of Appeals noted that, even had

Georgia Pacific warned workers and bystanders, the workers themselves were powerless

to reasonably contain the asbestos without protective clothing, changing rooms and safe

laundering facilities. *Id*. at 541. Similarly here, the circuit court found that

> The evidence does not support a finding that Mr. Schatz could as a matter of
> course leave his dusty clothes at BG&E each Friday or even on evenings and
> expect that they would be laundered when he returned to work. The
> occasional laundering testified to of overalls which were supplied by BG&E
> does not change that.

In both *Farrar* and the instant case, there was no evidence to show that a warning would

have been effective.

Because there was no evidence tending to show that it was feasible for JCI to warn

Mrs. Schatz, and no evidence tending to show how any such warning would have been

effective, *Farrar* instructs that JCI had no duty to warn Mrs. Schatz. Accordingly, the

circuit court did not err in granting JCI's motion for judgment.

II. HOUSEHOLD MEMBERS AS AN INDETERMINATE CLASS

Finally, we address appellants' argument that "The Circuit Court erred in finding

that household members constitute an indeterminate class, contrary to the holding in

*Farrar*." In issuing its ruling from the bench, the court stated "Unfortunately, for plaintiff

in our case there is no definite determinative class." Appellants correctly state that, in

*Farrar*, the Court of Appeals, in a footnote, stated

15

In attempting to illustrate the impossibility of determining the universe of persons who may need to be warned if the plaintiff's argument is accepted, Georgia Pacific raises the prospect of whether, if the worker rides a bus home or stops at a bar or grocery store on the way home, the duty to warn would extend to the bus driver, other passengers on the bus, the bartender, other patrons in the bar, the cashier in the grocery store, or other customers. That is not what is before us. *We are dealing only with household members, who constitute an identifiable class of individuals*.

*Id*. at 535 n.2 (emphasis added). We do not interpret this footnote as holding that a duty to warn extends to household members because they constitute an identifiable class of individuals. Because we have already explained why a warning in this case was neither feasible nor likely to be effective, any error by the court in essentially concluding that Mrs. Schatz was not in an "identifiable class of individuals" was harmless.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

16